**Opinion issued July 12, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-10-00667-CV**

_____

**SHEDRICK CHANDLER, Appellant**

**V.**

**CSC APPLIED TECHNOLOGIES, LLC, Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-57092**

---

**O P I N I O N**

Shedrick Chandler sued his former employer, CSC Applied Technologies, LLC ("CSC"), for race discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA"). CSC moved for both traditional and no-

evidence summary judgment and raised numerous objections to Chandler's summary judgment evidence. The trial court sustained seventy-four of CSC's objections and ultimately rendered summary judgment in favor of CSC. In three issues, Chandler contends that the trial court (1) erroneously rendered summary judgment on his race-discrimination claim because he raised genuine issues of material fact on each element challenged by CSC; (2) erroneously rendered summary judgment on his retaliation claim because he raised fact issues on each element challenged by CSC; and (3) erroneously sustained CSC's objections to his summary judgment evidence;

We affirm.

## Background

Chandler, an African-American, began working for CSC, a company that "provides aerospace and aviation maintenance and modification service programs to several clients," in 1994. Throughout his thirteen years of employment with CSC, Chandler worked as an electrician and avionics technician on several different types of aircraft, including temporary assignments to the WB-57 aircraft.

While Chandler was employed at CSC, two opportunities arose for employees to accompany the WB-57 aircraft to Afghanistan. Due to the danger of traveling to Afghanistan, and pursuant to its collective bargaining agreement, CSC management first asked the technicians specifically assigned to the WB-57 unit if

2

they wished to go on the trip, and it then looked for qualified volunteers outside of the WB-57 unit if not enough personnel within the unit volunteered. Management then compiled a "trip list" of qualified personnel to consider before making the final selections.

Chandler, who had experience working on the WB-57, sought to be placed on the trip list as an alternate avionics technician. CSC management ultimately chose two Caucasian technicians, Bill Hughey and Jeff Geoff, as alternates for the 2007 Afghanistan trip.[1] Chandler believed that he was qualified to accompany the WB-57, and he complained on several occasions to various supervisory and management employees at CSC that he believed he should be included as an alternate on the trip list. Chandler admitted during his deposition that, although he complained about not being included on the trip list, he never informed anyone at CSC that he believed he was not included on the list because of his race.

On Friday, June 22, 2007, Stephen Armstrong, the supervisor of CSC's engine shop, was working as the acting supervisor of the avionics shop, which was Chandler's unit. He received a call from CSC Maintenance Control requesting that an avionics employee work overtime on Saturday, June 23, beginning at 7:30 a.m. as "engineering support" for the WB-57. Pursuant to CSC rules and strict union

---

[1] CSC did not finalize the 2007 trip list until after Chandler's employment with CSC had ended; however, it is undisputed that CSC management had not included Chandler on the list of potential alternates for the trip.

3

protocols, Armstrong consulted the avionics shop's "overtime list," which must be consulted each time an overtime opportunity arises, and he ultimately called Chandler and asked him if he could work overtime on Saturday. Armstrong informed Chandler that he needed to be at CSC at 7:30 a.m. and that he would work an eight or ten hour shift. Chandler agreed to work the overtime.

On June 23, Chandler arrived at CSC and clocked in shortly after 5:00 a.m., which he believed was proper according to Armstrong's instructions. Due to a prior engagement, Chandler informed Jack McGee, the WB-57 crew leader, that he needed to leave at 1:00 p.m. He did not inform a supervisor that he was leaving at that time. Chandler did not believe that this qualified as "leaving early" because, since he had arrived at 5:00 a.m., he had worked a full eight-hour shift. According to Chandler, during the course of his work on the WB-57 that Saturday, David Lanmon, the supervisor of the WB-57 program, handed him four engineering work orders and told him, "Be prepared to work the weekend, and do not work over 12 hours a day." Chandler determined that the work orders were "not a one-day project," so he continued to work overtime on the WB-57 until he finished the work orders, coordinating with the regular members of the WB-57 crew regarding when they would arrive at work each day. On Monday, June 25, Lanmon specifically asked Chandler how much time he needed to finish the work orders. Chandler estimated that he would be finished by Tuesday, June 26, at the latest,

4

and he indeed finished working on the WB-57 on that date before returning to his usual job in the avionics shop.

That week, Jackie Lankford, the Support Shops Manager, contacted Robert Payne, the Program Manager of CSC's NASA Aviation Services, regarding concerns that Chandler had worked unauthorized overtime. On June 30, Payne held an "investigatory meeting" with Chandler, along with Richard Philips, the Chief Union Steward, Patrick Bousley, Director of Maintenance, Lankford, Heidi Ruby, Division Contract Administration Manager, and Jose O'Campo, Chandler's supervisor. According to Chandler, Chandler informed Payne that Armstrong told him to arrive at 5:00 a.m. on Saturday; that he then called David Wyckoff, an avionics technician on the WB-57, who told him that he would arrive at 5:30 a.m. on Saturday; and that Lanmon told him to "be prepared to work the weekend" in order to finish the engineering work orders he had given Chandler. Chandler stated that no one told him that he was not supposed to work on the WB-57 on Sunday, Monday, and Tuesday.

After this meeting, Payne spoke to Lanmon and received written statements from Armstrong, Lankford, and Wyckoff. Lanmon and Armstrong denied authorizing Chandler to work overtime on the WB-57 for any day other than Saturday, June 23. Wyckoff stated that he did not work that weekend, and he

5

denied speaking with Chandler regarding what time Chandler should arrive on Saturday.

After concluding the investigation, Payne and Ruby made the decision to terminate Chandler's employment with CSC on August 9, 2007, due to his actions involving the unauthorized overtime. Chandler was terminated for violating two of CSC's workplace rules, both of which require termination on the first offense: (1) "Falsification of personnel or other Company or contract related records," and (2) "Deliberate falsification of facts to management or similar form of dishonesty."

After obtaining a "Notice of Right to File a Civil Action" from the Texas Workforce Commission, Chandler filed suit against CSC on September 26, 2008, and asserted claims of race discrimination and retaliation. Specifically, Chandler alleged that CSC discriminated against him based on his race when it (1) refused to include him on the Afghanistan trip list and (2) terminated his employment. Chandler alleged that CSC retaliated against him for complaining to management about not being included on the Afghanistan trip list by terminating his employment.

CSC moved for both traditional and no-evidence summary judgment. In its no-evidence motion regarding Chandler's race discrimination claims, CSC contended that Chandler could present no evidence that (1) similarly situated non-protected class members were treated differently, (2) CSC's articulated reasons for

6

its employment decisions were false, or (3) racial discrimination was the real reason CSC made these particular employment decisions. Regarding Chandler's retaliation claim, CSC contended that Chandler could present no evidence that (1) he engaged in a protected activity, (2) a causal link existed between the alleged protected activity and the adverse action of Chandler's termination, (3) he would not have been terminated but for his alleged complaints of discrimination, and (4) CSC's articulated reason for its actions was a pretext for unlawful retaliation.

In its traditional summary judgment motion, CSC asserted that it did not include Chandler on the Afghanistan trip list because "Chandler did not have the necessary knowledge and skills for the tasks and challenges he could potentially face on the trip, including how to fix certain problems, such as the auto pilot and radar, on the WB-57 aircraft." CSC argued that Chandler could only speculate regarding the qualifications of the individuals chosen as alternates on the trip list, and he "has no firsthand knowledge of the breadth of their experience."

CSC also asserted that it terminated Chandler based on his actions involving the unauthorized overtime and his two workplace rule violations, both of which required termination on the first offense. CSC argued that it "had a good faith belief that Mr. Chandler worked unauthorized overtime and was untruthful in his attempt to provide justification for the hours he worked during the week of June 23, 2007." CSC further argued that its reasons for terminating Chandler were

7

"honest and legitimate," based on Chandler's inconsistent and contradictory excuses for his actions and the statements from Armstrong, Lanmon, Lankford, and Wyckoff, all of which contradicted Chandler's explanation of events. CSC also contended that Chandler could not establish that a fact issue existed regarding whether CSC unlawfully terminated Chandler based on his race because he could not point to any non-protected class members who engaged in the same rule violations and were not terminated.

Regarding Chandler's retaliation claim, CSC argued that Chandler could not establish that he engaged in a protected activity, because although he testified in his deposition that he complained to management that he was not included on the Afghanistan trip list, he did not complain that he believed he was not included because of his race. CSC also argued that Chandler could not establish a causal link between any protected activity and his termination because the two events were not temporally proximate, and Chandler could present no evidence that Payne and Ruby, the decision makers regarding the termination, had any knowledge that Chandler had complained about racial discrimination regarding the trip list. CSC contended that it would have terminated Chandler regardless of any complaints he made about the trip list because of his unauthorized overtime violations, which required termination on the first offense.

As summary judgment evidence, CSC attached the affidavit of Robert Payne—which included the statements of Lankford, Armstrong, and Wyckoff relating to the overtime investigation—excerpts from Chandler's deposition, and affidavits from Armstrong and Lanmon.

Payne averred that, occasionally, aircraft serviced by CSC are deployed to Afghanistan, and CSC must send a team of qualified employees to assist. CSC's collective bargaining agreement first requires it to request volunteers from the particular unit normally assigned to the aircraft and then allows CSC either to require low-seniority employees within the unit to go on the trip or to seek qualified volunteers from outside of the unit. For the second Afghanistan trip, Payne was required to look outside of the WB-57 unit for alternate technicians. He did not include Chandler on the trip list because Chandler "did not have the knowledge and skills required to handle certain problems that may arise on the WB-57 aircraft, including problems with the aircraft auto pilot and radar." Payne averred that Chandler never complained to him that he felt discriminated against based on his race for not being included on the trip list.

Payne further averred that, in late June 2007, Lankford approached him and informed him that he believed the hours recorded on Chandler's time card were inaccurate. Payne held an investigatory meeting on June 30, 2007, to allow Chandler to explain his hours and his conduct. During the meeting, Chandler

offered four different explanations for why he arrived at 5:00 a.m. on Saturday, June 23, to begin work, including explaining that Armstrong told him to be there at 5:30 and that Chandler called Wyckoff to ask what time he was arriving at work and he said 5:30.[2] Due to the conflicting explanations, Payne believed Chandler was not being truthful. Chandler admitted to Payne that he left work at 1:00 on Saturday without informing Armstrong or Lanmon, although he did obtain permission from Jack McGee, the WB-57 crew leader, who had no authorization to allow employees to leave early. Chandler also admitted that a supervisor did not instruct him to report to the WB-57 unit on Monday and Tuesday. Payne averred that during the investigation, he met with Armstrong, Lankford, Wyckoff, and Lanmon, all of whom contradicted Chandler's version of events.

Payne held a second meeting on August 9, 2007, at which he informed Chandler that CSC determined that Chandler had worked unauthorized overtime and then "supplied the Company with false information in his attempt to justify his actions." Payne provided Chandler another opportunity to explain, and Chandler repeated that he worked the overtime because Lanmon told him to "be prepared to work the weekend." Payne averred that Chandler then admitted that he "did not have authority to work the overtime in question, and he had scheduled himself on

---

[2] In his statement generated during the investigation, Wyckoff stated that he was not working on this particular weekend and he "did not ask or tell [Chandler] to come in at 0500."

10

his own." Payne gave Chandler a written letter of discharge, informing him of why CSC was terminating his employment.

Included with Payne's affidavit was a statement from Lankford dated June 29, 2007. Lankford stated that he reviewed the time sheets on Monday, June 25, and he noticed that Chandler had failed to clock out on Saturday when he left, which is not unusual for CSC employees, and he had then worked until Sunday evening. Because Lankford "[knew] that [Chandler] was not scheduled to work Sunday," he contacted Lanmon, who confirmed that he had not scheduled Chandler to work overtime on Sunday. On Tuesday, Lankford discovered that Chandler was still working on the WB-57, so he told Lanmon to tell Chandler to return to the avionics shop. Upon his return to the avionics shop, Chandler told Armstrong that he had worked Sunday because Lanmon wanted him to do so. Lankford noted that Chandler worked overtime on the WB-57 on Saturday through Tuesday, even though he was only officially scheduled for Saturday.

CSC also included the affidavits of Armstrong and Lanmon. Armstrong averred that he explicitly told Chandler that the engineer who would be working on the WB-57 on Saturday did not want to start before 7:30 a.m. He also stated that he did not give Chandler authority to work overtime on Sunday through Tuesday. Lanmon averred that after Chandler left work on Saturday, he "did not want or need Mr. Chandler to come back to work on the 990 WB-57 aircraft." He also

11

stated that he did not directly speak to Chandler about overtime, and he did not give Chandler authority to work overtime on the WB-57 on Monday and Tuesday. When Lanmon saw Chandler working on the WB-57 on Monday and Tuesday, he "assumed [Chandler] had been sent there by the direction of his supervisor or Maintenance Control."

In his summary judgment response, Chandler argued that CSC's stated reasons for not including him on the Afghanistan trip list and for terminating his employment were merely pretexts for racial discrimination and retaliation. As summary judgment evidence, Chandler attached his own deposition, as well as the depositions of Dave Canales, a Hispanic avionics technician for the WB-57 unit, Ricardo Hayes, an African-American egress technician, Armstrong, and Lanmon.

Canales testified generally about the work requirements and procedures at CSC, promotions, the Afghanistan trip lists, overtime, and the treatment of minority employees at CSC. Canales testified that he had worked with Chandler on the WB-57 and that Chandler had "several years of . . . engineering work order installation procedure [experience] on the WB-57." Canales was a "designated system inspector" for the WB-57, and he stated that Chandler was a "very good technician." Canales testified that CSC chose two Caucasian avionics technicians as alternates for the Afghanistan trip, "even though neither one of those [workers] had worked on the aircraft as much as [Chandler] had" and even though one of the

12

chosen workers had less seniority than Chandler.[3] Canales believed that Chandler was the most qualified employee for the alternate position. Chandler spoke with Canales about his frustrations and informed him that he tried to speak with several individuals in management to see if he could be included on the trip list. Canales testified that he thought Chandler was not included because of his race.

Canales estimated that ninety percent of the management at CSC is Caucasian. Canales testified that several coworkers, including two supervisors and a union steward, used to refer to Chandler by a derogatory, race-based nickname and would ridicule his allegedly poor spelling by posting his written reports on a bulletin board. Canales also testified that it could be hazardous to one's career to complain at CSC, and those who complained about how they were treated could be moved to other locations. Canales stated that, in his particular unit, the workload was "dumped on" the four non-Caucasians and that Caucasian employees could come to work intoxicated, could leave work early, and could "goof off" at work by playing video games and suffer no disciplinary repercussions. Canales named two specific employees who, he testified, had arrived at work intoxicated, one on multiple occasions in both Afghanistan and Las Vegas, neither of whom was

---

[3]     Canales himself accompanied the WB-57 to Afghanistan on two occasions as one of the primary avionics technicians.

13

terminated by CSC.[4] According to Canales, a Caucasian avionics technician in his unit received twenty percent of the workload and Canales received the remaining eighty percent, plus whatever work the Caucasian employee did not finish. When he complained to management, he was told to "stop complaining."

Regarding overtime and the completion of work orders, Canales testified that technicians are given some discretion in how they finish their work. Generally, he will work on a work order until it is completed or until he reaches a "good stopping point," and he has worked beyond a twelve-hour shift without being reprimanded. He testified that if one of the supervisors had told him to "be prepared to work the weekend," he would be authorized to work the entire weekend. He also stated that the technicians, who often worked in pairs, would agree between themselves on what hours they would work and that they would check with the supervisors to make sure they had no objections.

Chandler also attached the deposition of Ricardo Hayes, an egress technician. Hayes testified that his unit is entirely African-American and the "management team" at CSC is ninety-nine percent Caucasian. He estimated that approximately nine percent of CSC's entire workforce is African-American. He testified that he has been treated differently at CSC because of his race: CSC required greater qualifications for him to be hired than the next two Caucasian

---

[4] Canales named the specific individuals involved, but he gave no detail regarding when these alleged incidents occurred.

applicants for the same position. He stated that he had never heard anyone use derogatory racial slurs at CSC, but he knew that Chandler had a race-based nickname, although he had never heard it actually directed at Chandler.

Hayes also testified that, although his unit is "sometimes" specifically told when to arrive for work and when to leave, the technicians normally agree among themselves to come in early, and this is not a problem as long as they complete an eight-hour shift. Hayes stated that he has been told to stay "as long as he needed" to complete a work order. He opined that if he had been told to "be prepared to work the weekend, just don't exceed twelve hours," he would not expect to be reprimanded if he worked up to twelve hours on both Saturday and Sunday.

In its summary judgment reply, CSC objected to Canales's testimony "regarding his opinion of how Caucasian and minority employees of [CSC] are treated, including his assertion that Caucasian employees who report[ed] to work under the influence received no repercussions and minority employees receive[d] a largely disproportionate amount of the work load" on the grounds that this testimony constituted inadmissible hearsay and failed to set forth the basis of Canales's personal knowledge. CSC also objected to "[a]ny generalized assertions Mr. Canales makes in his deposition testimony regarding start times, completing work orders, overtime, and leaving early" as speculative.

At the hearing on CSC's summary judgment motions, the trial court requested that CSC clarify its objections to Chandler's summary judgment evidence by presenting its objections to Canales's and Hayes's testimony in a "line-by-line" format. The trial court gave Chandler an opportunity to respond to the clarified objections. CSC subsequently provided sixty-six objections to Canales's deposition testimony and ten objections to Hayes's deposition testimony. CSC objected on the basis that the testimony was conclusory and speculative, and that it lacked the basis for personal knowledge, and, occasionally, constituted inadmissible hearsay. The trial court sustained all but four of these objections, and provided Chandler an opportunity to supplement the summary judgment record with additional evidence. Chandler supplemented the record with Canales's affidavit, and the deposition testimony of Wyckoff, Payne, and Lankford.

CSC made two further objections to statements contained in Canales's affidavit. The trial court sustained both of these objections. The record contains no indication that Chandler objected to the trial court's ruling on these objections.

The trial court ultimately rendered summary judgment in favor of CSC on Chandler's racial discrimination and retaliation claims. The summary judgment did not specify the grounds for the trial court's decision. This appeal followed.

**Standard of Review**

We review de novo the trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When a party moves for both traditional and no-evidence summary judgment, we first review the trial court's ruling under the no-evidence standard of review. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the trial court properly granted the no-evidence motion, we do not consider the arguments raised regarding the traditional summary judgment motion. *See id.*

After an adequate time for discovery, a party may move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim on which the adverse party bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *see Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The burden then shifts to the nonmovant to produce evidence raising a genuine issue of material fact on the elements specified in the motion. TEX. R. CIV. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The trial court must grant the motion unless the nonmovant presents more than a scintilla of evidence raising a fact issue on the challenged elements. *Flameout Design & Fabrication*, 994 S.W.2d at 834; *see also Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam) ("An appellate court

17

reviewing a summary judgment must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented."). To determine if the nonmovant has raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2001) (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

To prevail on a traditional summary judgment motion, the movant must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). When, as here, the trial court's summary judgment does not state the basis for the court's decision, we must uphold the judgment if any of the theories advanced in the motion are meritorious. *Providence Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

## Race-Discrimination Claim

In his first issue, Chandler contends that the trial court erroneously rendered summary judgment in favor of CSC on his race-discrimination claim because he raised a fact issue (1) that similarly situated non-protected class members were treated more favorably and (2) that CSC's articulated reasons for its actions were untrue, and thus a mere pretext for discrimination, or that race was a motivating factor for its decisions.

Under the TCHRA, an employer commits an unlawful employment practice if, because of an employee's race, the employer "discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment." TEX. LABOR CODE ANN. § 21.051(1) (Vernon 2006). The Texas Legislature patterned the TCHRA after federal law "for the express purpose of carrying out the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." *Elgaghil v. Tarrant Cnty. Junior Coll.*, 45 S.W.3d 133, 139 (Tex. App.—Fort Worth 2000, pet. denied); *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 474 (Tex. 2001) (stating same). Thus, when analyzing a claim brought under the TCHRA, we look not only to state cases, but also to the analogous federal statutes and the cases interpreting those statutes. *Toennies*, 47 S.W.3d at 476.

When, as here, the plaintiff asserts race-discrimination claims based on two separate and distinct incidents, he must establish a prima facie case of discrimination for each incident independently. *Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 434 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). To meet this burden of establishing a prima facie case of race discrimination, the plaintiff must show that: (1) he was a member of a protected class, (2) he suffered an adverse employment action, and (3) non-protected class employees were not treated similarly. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973); *McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 554 (Tex. App.—Dallas 2006, no pet.). Subjective beliefs of discrimination alone are insufficient to establish a prima facie case. *McCoy*, 183 S.W.3d at 554 (citing *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied)).

Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant-employer to articulate legitimate non-discriminatory reasons for any allegedly unequal treatment. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Greathouse v. Alvin Indep. Sch. Dist.*, 17 S.W.3d 419, 423 (Tex. App.—Houston [1st Dist.] 2000, no pet.). After the employer articulates a non-discriminatory reason, the burden then shifts back to the plaintiff to prove that the articulated reason is a mere pretext for unlawful discrimination. *McDonnell*

20

*Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825; *Greathouse*, 17 S.W.3d at 423. Although the burden of production shifts between the parties, the burden of persuasion "remains continuously with the plaintiff." *Greathouse*, 17 S.W.3d at 423.

To raise a fact issue on the pretext element of a race-discrimination claim, the nonmovant must present evidence "indicating that the non-discriminatory reason given by the employer is false or not credible, and that the real reason for the employment action was unlawful discrimination." *Elgaghil*, 45 S.W.3d at 140. A plaintiff can avoid summary judgment if the evidence, taken as a whole, creates a fact issue "as to whether each of the employer's stated reasons was not what actually motivated the employer *and* creates a reasonable inference that [race] was a determinative factor in the actions the plaintiff is now complaining about." *Id.* (emphasis in original); *see also Little v. Tex. Dep't of Criminal Justice*, 177 S.W.3d 624, 632 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("[T]he United States Supreme Court has made it clear that it is not sufficient merely to show that the employer's reasons are false or not credible; the plaintiff must prove that the employer discriminated intentionally.") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47, 120 S. Ct. 2097, 2108 (2000)). An employee's subjective belief that his employer has given a false reason for the employment decision is not competent summary judgment evidence. *Elgaghil*, 45 S.W.3d at

21

141; *see also Greathouse*, 17 S.W.3d at 425 ("Summary judgment for the defendant is proper when a plaintiff claiming race discrimination presents only conclusory allegations, improbable inferences, unsupportable speculation, or subjective beliefs and feelings.").

### A. *Trip to Afghanistan*

Chandler first contends that CSC improperly considered his race as a motivating factor in its decision not to include him on the list of employees to accompany the WB-57 aircraft on a trip to Afghanistan. We assume, without deciding, that Chandler established a prima facie case that CSC discriminated against him based on his race when it did not include him on the trip list but did include two Caucasian employees as alternate avionics technicians.

In its summary judgment motion, CSC stated that it did not include Chandler on the trip list because he was not qualified to make the trip. Robert Payne specifically averred that Chandler "did not have the knowledge and skills required to handle certain problems that may arise on the WB-57 aircraft, including problems with the aircraft auto pilot and radar." Lack of qualifications is a legitimate, non-discriminatory reason for not including Chandler on the Afghanistan trip list. *See Little*, 177 S.W.3d at 631 (noting, in context of failure to hire complainant, that "[s]electing a more qualified applicant generally constitutes a legitimate, nondiscriminatory justification"). Thus, by providing a legitimate

22

reason for its actions, CSC "eliminate[d] the presumption of discrimination created by [Chandler's] prima facie case." *See McCoy*, 183 S.W.3d at 554 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S. Ct. 1089, 1094–95 (1981)). The burden thus shifted back to Chandler to raise a fact issue that CSC's reason was a mere pretext for unlawful discrimination. *See Greathouse*, 17 S.W.3d at 423.

As evidence that this reason was a pretext for racial discrimination, Chandler points to Canales's testimony that neither of the two selected alternates had worked on the WB-57 aircraft as much as Chandler had and that one of the alternates had less seniority than Chandler. Canales stated that he knew that one of the alternates had less experience on the WB-57 because he was assigned to the WB-57 "for most of the tenure of [the alternate's] presence with CSC and so [he was] aware of what aircraft [the alternate] worked on and what aircraft [the alternate] had experience on."[5] Canales also testified that Chandler had "several years of installation or engineering work order installation procedure on the WB-57" and

[5] Although Canales testified during his deposition that both alternates had less experience on the WB-57 than Chandler, he refused to agree with defense counsel's question that both alternates "[were] less qualified than [Chandler] for this particular job." Chandler testified during his deposition that he believed that he had more experience on the WB-57 than one of the alternates, but he then agreed that he did not know what specific experience and qualifications that alternate had.

23

that he believed Chandler was a "very good technician" and was qualified to perform this work.

The summary judgment record included evidence that employees received qualifications for working on specific systems on a particular aircraft. Although Chandler presented summary judgment evidence that he had experience working on the electrical systems of the WB-57, he presented no evidence regarding (1) the specific qualifications that were required for CSC to consider him to accompany the WB-57 to Afghanistan, (2) his own particular qualifications on the other systems of the WB-57, or (3) the specific WB-57 qualifications of the two alternates chosen for the trip list. "Merely disputing [the employer's] assessment of [the employee's] qualifications will not create an issue of fact." *McCoy*, 183 S.W.3d at 555 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)); *Russo,* 93 S.W.3d at 440 ("The evidence of relative qualifications must be more than merely subjective and speculative. It must be specific and comparative in nature."). Employment discrimination laws "were not intended to be vehicles for judicial second-guessing of employment decisions nor intended to transform courts into personnel managers." *McCoy*, 183 S.W.3d at 555–56 (citing *Jaso v. Travis Cnty. Juvenile Bd.*, 6 S.W.3d 324, 332 (Tex. App.—Austin 1999, no pet.)).

Although Chandler presented evidence that minority workers were treated differently at CSC—for example, Canales testified that he and the other non-Caucasian avionics technicians in his particular unit had a much higher workload than the Caucasian technicians and Hayes testified that CSC required additional qualifications when it hired him as opposed to two later-hired Caucasians—Chandler presented no evidence that CSC considered an employee's race when it made its selections for the Afghanistan trip list or that CSC failed to include Chandler on the trip list because he is African-American. Canales, a Hispanic, testified that he accompanied the WB-57 to Afghanistan as one of the primary avionics technicians on two occasions.

Chandler also points to his race-based derogatory nickname used by a few CSC employees as evidence that CSC's stated reasons for its actions were a mere pretext and that Chandler's race was a motivating factor in CSC's employment decisions.

For workplace comments to provide sufficient evidence of discrimination, the comments must be (1) related to the plaintiff's protected class, (2) proximate in time to the adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue. *Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 729–30 (Tex. App.—Fort Worth 2006, no pet.) (citing *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256

25

(5th Cir. 1999)); *Elgaghil*, 45 S.W.3d at 140. "Stray remarks made in the workplace by non-decision makers, without more, are not evidence of the employer's intent to discriminate." *Elgaghil*, 45 S.W.3d at 140; *see also M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 25 (Tex. 2000) (per curiam) ("Stray remarks, remote in time from Willrich's termination, and not made by anyone directly connected with the RIF decisions, are not enough to raise a fact question about whether UTMDA's reason for terminating Willrich was pretextual.").

Chandler testified that two management supervisors and one union steward at CSC referred to him by using a race-based derogatory nickname. He also testified that these employees ridiculed his allegedly poor spelling by displaying his written reports on bulletin boards. Chandler presented no evidence, however, that these comments were made close to the time of the adverse employment decision at issue here, that these employees had any authority over the employment decision at issue or any influence over those who did have the authority, or that the comments related to the employment decision at issue.[6] *See Niu*, 206 S.W.3d at 729–30; *Elgaghil*, 45 S.W.3d at 140.

---

[6] Canales testified that he heard Tom Wolfe, Stan Phillips, and Luther Levan use the nickname for Chandler. Wolfe and Phillips were "supervisors" and Levan was a union steward. There is no evidence that these men had any input in assembling personnel for the Afghanistan trip.

26

We therefore conclude that Chandler has failed to raise a fact issue regarding whether CSC's stated non-discriminatory reason for not including him on the Afghanistan trip list was a mere pretext for discrimination or whether his race was a motivating factor in CSC's decision. We hold that the trial court correctly rendered summary judgment in favor of CSC on Chandler's claim that CSC discriminated against him by failing to include him on the Afghanistan trip list.

We overrule this sub-issue.

### B. Termination of Employment

Chandler also contends that CSC discriminated against him based on his race when it terminated his employment after an investigation into whether he worked unauthorized overtime. CSC first argues that Chandler did not establish a prima facie case of racial discrimination because he "fail[ed] to identify similarly situated individuals who were treated more favorably with respect to his termination."

To prevail on his claim for race discrimination, Chandler had to prove that he was treated less favorably than similarly situated members of a non-protected class. *See McCoy*, 183 S.W.3d at 554 (listing whether non-protected class employees were treated similarly as element of prima facie case in race discrimination claim); *see also Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam) (stating same for gender discrimination claim).

27

The Texas Supreme Court has held that employees are similarly situated "if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Monarrez*, 177 S.W.3d at 917. In a disparate discipline case, "the disciplined and undisciplined employees' misconduct must be of 'comparable seriousness.'" *Id.* The *Monarrez* court noted that although the United States Supreme Court had previously held that "precise equivalence in culpability between employees is not the ultimate question," the Fifth Circuit had held that "the plaintiff must usually show 'that the misconduct for which [the employee] was discharged was nearly identical to that engaged in by a[n] employee whom [the company] retained." *Id.* at 917–18 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 2580 (1976) and *Smith v. Wal-Mart Stores, Inc.*, 891 F.2d 1177, 1180 (5th Cir. 1990)). "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008) (per curiam); *see also Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (holding that comparisons to other employees not terminated were inapplicable because other employees violated different workplace rules and thus were not "nearly identical").

CSC stated that it terminated Chandler because, after the investigation into his allegedly unauthorized overtime, it determined that he committed the following

28

rule violations: (1) falsification of personnel or other company or contract related records, and (2) deliberate falsification of facts to management or similar form of dishonesty. Chandler produced evidence that Caucasian employees committed "egregious" violations of other rules.[7] Chandler also presented testimony that Caucasian employees in the WB-57 unit were allowed to come to work early and leave work past the usual stopping time, which constituted overtime, without authorization from supervisory personnel. Canales testified that this happened "routinely," that he knows the supervisor had not told these employees to come in early, and that one employee arrived at work an hour and a half early every day. According to Chandler, these employees were not reprimanded or investigated, nor was their employment terminated for working unauthorized overtime.

Chandler thus presented evidence that non-protected class members violated the same workplace rule that he did—working unauthorized overtime—but CSC did not terminate their employment. Assuming that Chandler raised a fact issue that similarly situated members of a non-protected class were treated more favorably, a requirement for his prima facie case, we consider whether Chandler raised a fact issue regarding whether CSC's articulated nondiscriminatory reason for terminating him—that he violated two CSC rules by working unauthorized

---

[7] For example, Canales testified that a Caucasian employee repeatedly arrived at work intoxicated, including while on work-related trips to Afghanistan and Las Vegas, and "[CSC] sent him home and then offered him the employee assistance program, instead of termination."

overtime and then lying to CSC management during the subsequent investigation—was false and thus a mere pretext for racial discrimination.

CSC contends that even if Chandler raised a fact issue regarding whether he actually worked unauthorized overtime, this fact is irrelevant, because the ultimate inquiry is whether CSC had a good faith belief that Chandler had violated the workplace rules. CSC also contends that Chandler presented no evidence that, even if its reasons for terminating Chandler were false, CSC terminated him because of his race. We agree with CSC.

When an employer's decision to terminate a claimant's employment is based on the results of an investigation into whether the claimant violated workplace rules, "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *see also Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."); *Elgaghil*, 45 S.W.3d at 141 ("[A]n employee's subjective belief

30

that an employer has given a false reason for its employment decision is not competent summary judgment evidence.”).

In *Waggoner v. City of Garland*, the City terminated Waggoner after it received sexual harassment complaints from one of Waggoner's coworkers. 987 F.2d 1160, 1162 (5th Cir. 1993). Waggoner, who disputed the sexual harassment allegations, contended that his termination based on the harassment allegations was a pretext for discriminating against him based on his age. *Id.* at 1163. In affirming the summary judgment in favor of the City, the Fifth Circuit noted a distinction between employment discrimination cases in which the employer's stated reason for the discharge relies upon “the employer's own evaluation of the employee”— e.g., the employee's job performance was unsatisfactory or another employee was better qualified—and cases in which the employer begins an investigation and ultimately discharges the employee based on the complaints of other employees. *Id.* at 1165. In the latter situation,

> [T]he validity of the initial complaint is not the central issue, because the ultimate falseness of the complaint proves nothing as to the employer, only as to the complaining employee. The real issue is whether the employer reasonably believed the employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually believe the co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal. Thus, the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.

31

*Id.* at 1165–66; *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 517 (E.D. Pa. 2010) ("It is not the veracity of allegations made against plaintiff by other employees which is at issue, but 'rather the integrity of [defendant's] decision-making process in terminating plaintiff.'") (quoting *Cange v. Philadelphia Parking Auth.*, No. 08-3480, 2009 WL 3540784, at *12 (E.D. Pa. Oct. 30, 2009)); *Evans v. Tex. Dep't of Transp.*, 547 F. Supp. 2d 626, 647 (E.D. Tex. 2007) ("The inaccuracy of reports, absent evidence that management was somehow complicit, is not indicative of discrimination or pretext.").

The Fifth Circuit concluded that Waggoner's summary judgment evidence relating to his "innocence of the sexual harassment charge" was irrelevant and held that "[h]e must, instead, produce evidence demonstrating that [the City's decision-makers] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him *on the basis of his age.*" *Waggoner*, 987 F.2d at 1166 (emphasis in original). Because Waggoner did not produce such evidence, the court held that he did not raise a fact issue on age-based discrimination. *See id.*; *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *Sagaral v. Wal-Mart Stores Tex. LP*, 516 F. Supp. 2d 782, 799 (S.D. Tex. 2007) ("[N]othing in the record creates a fact issue as to whether Wal-Mart's termination

of Sagaral's employment was made in bad faith. Wal-Mart made a detailed investigation, talking to a number of employees, including Sagaral, who provided inconsistent descriptions and explanations of his own conduct and statements to his coworkers.").

Here, the summary judgment record included evidence that Chandler, who was a general avionics technician and was not specifically assigned to the WB-57 aircraft, worked overtime on the WB-57 on June 23 through June 26, 2007. After observing Chandler working on the aircraft and reviewing his time reports, Jackie Lankford believed that Chandler had worked unauthorized overtime and informed Robert Payne. Payne began an investigation into the allegations. During the initial investigatory meeting, Chandler provided inconsistent explanations for why he arrived at work at 5:00 a.m. on June 23, and Payne believed that Chandler was not being truthful. Over the next six weeks, Payne obtained written statements from Armstrong, Lankford, Lanmon, and Wyckoff, all of whom disagreed with Chandler's account of events. After a second meeting with Chandler in which Chandler repeated the same inconsistent explanations for his actions, Payne ultimately made the decision to terminate Chandler's employment with CSC for violating two workplace rules. According to Payne, Chandler admitted during the second meeting that "he did not have authority to work the overtime in question, and he had scheduled himself on his own."

During his deposition, Chandler testified to the contrary and asserted that he had authority to work overtime on June 24–26. According to Chandler, when he was present on Saturday, June 23, at Armstrong's direction, Lanmon handed him four engineering work orders and told him, "Be prepared to work the weekend, and do not work over [twelve] hours a day." Because these work orders were "not a one-day project," Chandler testified that he continued working on the WB-57 on Sunday, Monday, and Tuesday until he completed the work orders. Chandler further testified that he informed Payne during the first investigatory meeting that Lanmon authorized him to work the entire weekend until the orders were completed.[8]

By asserting that he had authority to work the overtime in question, Chandler raised a fact issue regarding whether he appropriately worked overtime. Although Chandler contends that the *Waggoner* analysis is inapplicable, and, thus, he raised a fact issue that CSC's reason for the termination was a pretext, we disagree. *See Sagaral*, 516 F. Supp. 2d at 798 (applying *Waggoner* analysis in

---

[8] In his deposition, Lanmon testified that he did not assign Chandler any work orders on Saturday, June 23, 2007. He also testified that he told Jack McGee, the crew leader on the WB-57, that the "B-57 guys" needed to be prepared to work the weekend and that he would finalize the overtime list later that afternoon. He acknowledged that Chandler was standing within earshot of this conversation and with his back to Lanmon when Lanmon made this statement to McGee. He testified that he was not speaking to Chandler and that he did not intend to include Chandler in the conversation.

cases "involving an allegation of wrongful [employee] conduct, followed by an investigation and discharge").

CSC began its investigation into Chandler's overtime after Jackie Lankford suspected that Chandler was working overtime on the WB-57 without authorization. CSC obtained statements from the two supervisors with authority to assign Chandler overtime, Armstrong and Lanmon, interviewed Chandler twice, and ultimately believed Armstrong's and Lanmon's statements that they did not assign overtime to Chandler for June 24–26. Because this case involves allegations of misconduct initially made by another employee, the central issue is not whether the initial allegations of improper overtime were true; rather, the issue is whether CSC reasonably believed the allegations of misconduct and acted on them in good faith. *See Waggoner*, 987 F.2d at 1165. As such, Chandler's evidence asserting that he had authorization to work the overtime in question is irrelevant. *See id.* at 1166. To demonstrate a fact issue, he had to present evidence that those in charge of making the termination decision did not believe the unauthorized overtime allegations, but instead used the allegations as a bad faith pretext to discriminate against him on the basis of his race.[9] *See id.* at 1165–66;

_____

[9] Chandler notes that the management personnel present during the weekend did not question his presence at the WB-57 hangar or inform him that he was working unauthorized overtime and that CSC originally approved his overtime. Jackie Lankford testified that he began looking into Chandler's overtime on Monday, June 25, after he received a complaint from an engineer that Chandler had called

*see also Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ("[Jackson's] own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that Cal-Western's decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith. Jackson's assertion of innocence alone does not create a factual issue as to the falsity of Cal-Western's proffered reason for terminating him."). Chandler has presented no such evidence.

Chandler argues that he presented evidence of discriminatory intent because CSC employees used derogatory racial slurs to refer to him and ridiculed his spelling ability. Chandler presented testimony that Luther Levan, a union steward, was one of the CSC employees who used derogatory nicknames to refer to him. Payne testified that after the improper overtime allegations came to his attention he had a meeting with human resources and union representatives, including "maybe Luther Levan because he was the steward of the B-57 unit," during which the participants discussed Chandler's lack of authority to work the overtime at issue. Payne also testified that he "reviewed the situation with union people," including, to the best of his recollection, Levan and Richard Phillips, the chief union steward.

him at home with a question on Saturday, and, when the engineer arrived at CSC, Chandler was not present. Lankford also testified that CSC originally approved Chandler's time card, with Lankford's objections to the overtime noted, so that Chandler would be timely paid for the hours that he had properly worked during the relevant pay period.

36

Neither Payne nor Chandler named Levan as one of the attendees at the meeting at which CSC terminated Chandler's employment, although they both testified that Richard Phillips was present.

As we have already observed, for workplace comments to provide sufficient evidence of discrimination the remarks must be (1) related to the protected class, (2) proximate in time to the adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue. *See Niu*, 206 S.W.3d at 729–30; *Elgaghil*, 45 S.W.3d at 140. Although Chandler presented evidence that Payne consulted Luther Levan, a union steward who allegedly called Chandler a derogatory nickname, during the course of investigating Chandler's allegedly unauthorized overtime, he presented no evidence that Levan had any authority or influence over the decision to terminate Chandler's employment, which was ultimately made by Payne and Heidi Ruby. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011) ("As we have already acknowledged, the requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. Thus, if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable.") (supervisors had discriminatory motive in issuing "Corrective Action"; ultimate decision-maker

relied on supervisors' accusation and terminated employment for alleged failure to follow corrective action); *see also Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 344 (5th Cir. 2002) ("Moreover, Dr. Miller had no authority over the decision to suspend Dr. Patel. Dr. Miller's role in Dr. Patel's suspension was limited to the report he drafted on behalf of Dr. Brown and the Cardiovascular Committee, which recommended outside review of Dr. Patel's cases. Dr. Miller was not a member of the MEC—the body that voted to suspend Dr. Patel—nor was he a member of the MCC—the body that recommended suspension.").

Furthermore, Chandler presented no evidence that the nickname was used proximate in time to the adverse employment decision at issue. Although both Chandler and Canales testified that Levan used the nickname, they did not state that they heard it used close in time to when CSC terminated Chandler's employment. The only concrete time frame Chandler gives for when he heard Levan use the nickname was when he was temporarily assigned to the WB-57 unit in 2001, six years before CSC terminated Chandler's employment. *See Niu*, 206 S.W.3d at 730 (holding comment made eight months prior to termination not proximate in time to employment decision). Chandler also presented no evidence that the nickname was related to this particular employment decision, his termination. *See Coastal Mart, Inc. v. Hernandez*, 76 S.W.3d 691, 697 (Tex. App.—Corpus Christi 2002, pet. dism'd) (upholding jury verdict finding gender

38

discrimination when employer replaced male store manager with female after employer made comments that female could manage store better and he preferred female for position and stating, "These remarks regarding a woman's preferable performance directly correspond with Flores's decision to terminate Hernandez"). These comments, therefore, do not constitute evidence that the CSC decision makers did not in good faith believe the unauthorized overtime allegations and instead used the allegations as a pretext for racial discrimination. *See Waggoner*, 987 F.2d at 1166.

Because Chandler has presented no evidence that CSC did not in good faith believe the unauthorized overtime allegations, but instead used the allegations as a pretext to terminate his employment because of his race, we conclude that the trial court correctly rendered summary judgment in favor of CSC on Chandler's claims for race discrimination. *See Jackson*, 602 F.3d at 380–81 ("[An age-based] comment alone, or in combination with Jackson's uncorroborated denial of any sexual harassment, is insufficient to establish a genuine issue of material fact as to pretext. There is substantial evidence that Jackson was fired for violation of Cal-Western's sexual harassment policy, and Jackson's only contravention of that evidence comes from his own assertions."); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003) (per curiam) ("[I]t is not sufficient for Canchola to present evidence that the harassment investigation was imperfect, incomplete, or

39

arrived at a possibly incorrect conclusion. He must show that the reason proffered by Wal-Mart is 'false, *and* that discrimination was the real reason.'") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993)) (emphasis in original).

We overrule Chandler's first issue.

## Retaliation

In his second issue, Chandler contends that the trial court erroneously rendered summary judgment in favor of CSC on his retaliation claim because he raised fact issues that (1) he engaged in a protected activity by complaining to CSC management that he was not included on the Afghanistan trip list because of his race, (2) a causal link existed between his complaints and his termination, and (3) CSC's articulated reason for his termination was untrue or that retaliation was a motivating factor in the decision to terminate his employment.

The TCHRA prohibits an employer from retaliating against an employee for engaging in certain protected activities. TEX. LABOR CODE ANN. § 21.055 (Vernon 2006). To prevail in a retaliation action under this section, the plaintiff must first establish a prima facie case showing that: (1) he engaged in protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Hernandez v. Grey Wolf Drilling, L.P.*, 350 S.W.3d 281, 286 (Tex. App.—San Antonio June 22, 2011, no pet.); *Dias*

*v. Goodman Mfg. Co.*, 214 S.W.3d 672, 676 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Protected activities consist of (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing. TEX. LABOR CODE ANN. § 21.055. If the plaintiff establishes a prima facie case, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory purpose for the adverse employment action. *Hernandez*, 350 S.W.3d at 286; *Dias*, 214 S.W.3d at 676; *see also McCoy*, 183 S.W.3d at 555 (noting that retaliation claims use "[t]he same burden-shifting analysis" as race-discrimination claims). "[A]n employee's subjective beliefs of retaliation are merely conclusions and do not raise a fact issue precluding summary judgment in a retaliatory discharge claim." *Niu*, 206 S.W.3d at 731 (citing *Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994)).

A plaintiff asserting a retaliation claim must establish that, in the absence of his protected activity, the employer's prohibited conduct would not have occurred when it did. *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 377 (Tex. App.—Fort Worth 2006, no pet.). Thus, the plaintiff must establish a "but for" causal nexus between the protected activity and the prohibited conduct. *Id.* The plaintiff is not required to establish that the protected activity was the sole cause of the employer's prohibited conduct. *Id.*

"[A]ctionable retaliation exists when an employer makes an adverse employment decision against an employee who *voices opposition to conduct made unlawful under the [T]CHRA*, regardless of whether the employee has already filed a formal complaint with the Commission." *City of Waco v. Lopez*, 259 S.W.3d 147, 152 (Tex. 2008) (emphasis added); *see also Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000) (noting that, under Title VII, employee engages in protected activity if he "oppose[s] any practice made an unlawful employment practice by [Title VII]" and holding that employee need not prove employer's practices were "actually unlawful" but only that employee had "reasonabl[e] belief that the employer was engaged in unlawful employment practices"); *Marsaglia v. Univ. of Tex., El Paso*, 22 S.W.3d 1, 5 (Tex. App.—El Paso 1999, pet. denied) (noting that plaintiff's burden is to establish that "conduct was 'opposition' to an unlawful employment practice and thus a protected activity").

CSC contends that Chandler failed to establish a prima facie case of retaliation because he presented no evidence that he engaged in the protected activity of complaining that he was not included on the Afghanistan trip list *because of his race* and was then subsequently terminated. We agree.

As summary judgment evidence, Chandler presented his deposition testimony, in which he testified that he complained to numerous supervisors and

42

others in the management hierarchy at CSC that he was not included on the Afghanistan trip list and that he repeatedly asked for explanations of why he was not included on this list. During his deposition, Chandler had the following exchange with CSC's attorney:

[CSC's counsel]: Did you complain to management, as you said you complained to management about not being on the list, did you complain to management and say, "This is because of my race"?

[Chandler]: No, I did not.

Shortly thereafter, the following exchange occurred:

[CSC's counsel]: So you complained that you felt you were eligible to go [to Afghanistan]?

[Chandler]: Yes, I did.

[CSC's counsel]: Okay. And did you complain that any reason why you were considered not eligible to go was because of your race?

[Chandler]: No, I didn't.

Chandler presented no evidence that he complained to CSC that he felt he was not included on the Afghanistan trip list because of his race. Thus, Chandler presented no evidence that, by complaining to CSC that he was not included on the Afghanistan trip list when he believed that he was "eligible" to go on the trip, but not specifically informing CSC management that he believed his race was the reason why he was not included on the list, he "voice[d] opposition to conduct made unlawful under the [T]CHRA." *Lopez*, 259 S.W.3d at 152; *see Marsaglia*,

43

22 S.W.3d at 5; *see also Harris-Childs v. Medco Health Solutions, Inc.*, 169 Fed. App'x. 913, 916 (5th Cir. 2006) ("Although her deposition demonstrates she complained of unfair treatment . . . she has not demonstrated that she put the employer on notice that her complainant was based on racial or sexual discrimination. Because she has failed to show that she engaged in a protected activity under Title VII, she cannot show retaliation."); *Evans*, 547 F. Supp. 2d at 654 ("Specifically, although Evans complained of a purportedly hostile work environment, at no time did she suggest that McCray's conduct was related to Evans's race, sex, age, disability, or other characteristic protected by Title VII.").

Because Chandler presented no evidence that he engaged in a protected activity when he complained to CSC that he was not included on the Afghanistan trip list but did not complain that he believed that this exclusion was racially motivated, we conclude that Chandler did not establish an essential element of his prima facie case of retaliation. We therefore hold that the trial court correctly rendered summary judgment in favor of CSC on Chandler's retaliation claim.

We overrule Chandler's second issue.

### Objections to Summary Judgment Evidence

Finally, in his third issue, Chandler contends that the trial court erroneously sustained seventy-four of CSC's objections to his summary judgment evidence.

We review a trial court's ruling sustaining objections to summary judgment evidence for an abuse of discretion. *Finger v. Ray*, 326 S.W.3d 285, 290 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The appellant bears the burden to bring forth a record sufficient to show that the trial court abused its discretion when it sustained the objections. *Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.). To reverse a judgment based on the erroneous exclusion of evidence, the appellant must demonstrate that the exclusion probably resulted in an improper judgment. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *see also* TEX. R. APP. P. 44.1(a)(1). A successful challenge to the trial court's evidentiary rulings generally requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded. *Interstate Northborough P'ship*, 66 S.W.3d at 220 (citing *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000)). Ordinarily, we will not reverse a judgment due to the erroneous exclusion of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

Here, Chandler argues that the trial court erroneously sustained seventy-four objections to his summary judgment evidence. CSC objected to various statements in depositions of Canales and Hayes on the grounds that their testimony was conclusory, speculative, not based on personal knowledge, and constituted inadmissible hearsay. Although Chandler argues on appeal that CSC's objections

45

were not meritorious, he does not demonstrate how the allegedly erroneous exclusions probably resulted in an improper judgment. *See id.* He also does not demonstrate that the summary judgment turns on a particular piece of evidence that was excluded or that the evidence excluded was not cumulative and was controlling on a dispositive material issue. *See id.*

For example, Chandler argues that the trial court erroneously excluded Canales's testimony regarding the derogatory nickname that some CSC employees used to refer to Chandler, because Canales heard this nickname applied to Chandler and thus had personal knowledge regarding its use. However, not only did the trial court admit evidence from Chandler's deposition regarding this nickname, we have held that this evidence does not create a fact issue on the question of whether CSC's articulated nondiscriminatory reasons for its actions were a pretext because Chandler did not demonstrate that this racial slur was used by CSC employees with authority over the particular employment decisions at issue here, that employees used the slur proximate in time to the employment decisions, or that the slur related to the employment decisions. *See Niu*, 206 S.W.3d at 729–30; *Elgaghil*, 45 S.W.3d at 140. Thus, Canales's testimony on this matter is both cumulative and not controlling on a material issue. *See Interstate Northborough P'ship*, 66 S.W.3d at 220.

Similarly, the trial court sustained CSC's objection to Canales's testimony that Chandler was qualified to go on the Afghanistan trip and should have been placed on the trip list. However, as we have discussed, Canales did not testify regarding Chandler's specific qualifications to work on the WB-57 or regarding the WB-57 qualifications of the alternates selected to go on the trip. When the issue is relative qualifications, the evidence "must be more than merely subjective and speculative"; instead, it "must be specific and comparative in nature." *Russo*, 93 S.W.3d at 440. Canales did not provide "specific and comparative" testimony regarding the relative qualifications of Chandler and the selected alternates. Thus, his testimony was not "controlling" on the issue of whether "similarly situated" members of the non-protected class were treated more favorably than Chandler.

Because Chandler has not demonstrated that any of the summary judgment evidence excluded by the trial court is not cumulative and is controlling on a material issue and that the summary judgment turns on the particular evidence excluded, we conclude that any error by the trial court in sustaining CSC's objections is harmless.

We overrule Chandler's third issue.

**Conclusion**

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.