Donald DIAS, Appellant

v.

GOODMAN MANUFACTURING COM-
PANY, L.P., Goodman Holding Com-
pany, and Quietflex Manufacturing
Company, L.P., Appellees.

No. 14–05–00836–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 9, 2007.

G. Scott Fiddler, Houston, for appellant.

Edwin Sullivan, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this retaliatory discharge case, appellant Donald Dias challenges the summary judgment granted in favor of his employer, Goodman Manufacturing Company, L.P. ("Goodman"), and related companies Goodman Holding Company ("GHC") and Quietflex Manufacturing Company, L.P. ("Quietflex"). Dias argues he was discharged in violation of the Texas Commission on Human Rights Act ("TCHRA").

Specifically, Dias contends he was terminated by Goodman because (a) his mother had filed an age discrimination complaint against Quietflex, (b) appellees perceived Dias as assisting his mother in prosecuting her claim or as a potential witness on her behalf, or (c) Dias actually assisted his mother with her age discrimination claim. Dias further contends that Quietflex and GHC are part of an integrated enterprise with Goodman, and asserts a third-party interference claim against Quietflex.[1] Because Goodman did not engage in protected conduct and Texas Labor Code section 21.055 does not recognize a cause of action for retaliation against a person who has not personally engaged in a protected activity, we affirm. *See* TEX. LAB.CODE ANN. § 21.055 (Vernon 2006).

### I. FACTS AND PROCEDURAL HISTORY

Dias began working for Goodman as a PC analyst in 1996. He learned of the job opening from his mother, Shirley Dias, who was employed by Quietflex. Quietflex was formerly a department of Goodman until it became a separate entity in 1993. In approximately 1998, Dias was promoted to the job of Network Systems Manager.

Quietflex terminated Shirley Dias on April 4, 2003. Within a day of his mother's termination, Dias spoke with his supervisor, Ed Lilley, and with human resources representative Wanda Ford about her re-employment. Dias asked if there was anything he could do to help his mother, and both Lilley and Ford told Dias there was not. According to Dias, Lilley told him he was "better off being quiet and not to interfere," and that Dias "could not help her if [he] was unemployed." Dias further testified that Ford told him "[he] would be best by not taking it any farther"

---

1. In his Original Petition, Diaz asserts claims of third-party interference against both Quietflex and GHC, but he appeals the trial court's judgment on this claim only with regard to Quietflex.

and he should "go back and basically do [his] job."

On April 29, 2003, Shirley Dias sent a demand letter to Quietflex asserting an age discrimination claim. She filed a charge of age discrimination against Quietflex with the Equal Employment Opportunity Commission ("EEOC") on May 20, 2003. On or about the same day, Goodman's Chief Information Officer, Terry Smith, reported concerns that Dias and another employee, Charles Espinoza, were accessing other employees' email mailboxes without the authorization of the employees concerned. One week later, Goodman began investigating whether Dias and Espinoza had in fact accessed employees' email without their permission. The investigation indicated that Dias had accessed Lilley's email mailbox on December 20, 2002; February 19, 2003; February 21, 2003; May 13, 2003; and June 5, 2003. Dias had similarly accessed Smith's mailbox on May 13, 2003. On June 17, 2003, Dias verbally acknowledged that on May 13, 2003, he had accessed the mailboxes of Lilley and Smith. At his employer's request, Dias wrote a statement in which he explained, "I had compose[d] an email which I sent and quickly regretted. I chose to delete the message prior to it being read versus recalling it." Goodman immediately terminated Dias's employment.

On March 22, 2004, Dias filed suit against Goodman, Quietflex, and GHC for retaliatory discharge under section 21.055 of the TCHRA. According to Dias, he was discharged in retaliation for his mother's claim against Quietflex and because appellees perceived Dias was assisting his mother in prosecuting her claims or would testify on her behalf. Appellees moved for traditional and no-evidence summary judgment on the grounds that (1) Dias did not engage in a protected activity; (2) his "perception of participation or assistance" claim is not recognized under Texas law; (3) there was no causal connection between Dias's participation in an alleged protected activity and his termination; (4) Quietflex and GHC did not control access to Dias's employment opportunities and did not deny or interfere with that access based on unlawful criteria, or there is no evidence of such control and interference; and (5) Dias cannot rebut Goodman's legitimate reasons for discharging him as pretextual. The trial court granted appellees' motion for summary judgment without stating the grounds for its ruling, and this appeal ensued.

## II. Issues Presented

In three issues, Dias argues the trial court erred in granting summary judgment (a) in favor of Goodman on Dias's retaliation claim, (b) in favor of Quietflex on Dias's third-party interference claim, and (c) in favor of Quietflex and GHC on Dias's claim that the three appellees are "an integrated enterprise."

## III. Standard of Review

We review summary judgments de novo, *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005), and where the trial court grants the judgment without specifying the grounds, we affirm the summary judgment if any of the grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex.2000). We consider all grounds the appellant preserves for review that are necessary for final disposition of the appeal. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996). Here, the appellees moved for summary judgment on both traditional and no-evidence grounds; thus, we apply the familiar standard of review appropriate for each type of summary judgment, taking as true

all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *See Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 157 (Tex. 2004) (traditional summary judgment); *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (no-evidence summary judgment).

■■■ In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979).

■■■ In a no-evidence summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the nonmovant bears the burden of proof at trial. TEX.R. CIV. P. 166a(i); *Green v. Lowe's Home Ctrs., Inc.,* 199 S.W.3d 514, 518 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only

evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc.,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

## IV. APPLICABLE LAW

■■■ Dias brought this retaliation claim under section 21.055 of the Texas Commission on Human Rights Act. *See* TEX. LAB.CODE ANN. § 21.055 (Vernon 2006). In an action arising under this statute, the plaintiff must first make a prima facie showing that: (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Pineda v. United Parcel Serv., Inc.,* 360 F.3d 483, 487 (5th Cir.2004). Protected activities consist of (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing. *See* TEX. LAB.CODE ANN. § 21.055 (Vernon 2006). The burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the adverse employment action. *Pineda,* 360 F.3d at 487.

## V. ANALYSIS

### A. Failure to Establish a Prima Facie Case of Retaliation

Appellees argue in their motion for summary judgment and on appeal that Dias

failed to make the required prima facie showing of retaliation. We agree.

### 1. Third–Party Retaliation

■ The theory on which Dias relies most heavily is that of third-party retaliation; that is, Dias argues that he was terminated because his mother engaged in the protected activity of filing an age discrimination complaint:

Q: What is the basis for your belief that your termination was retaliatory?

A: My mother was terminated from Quietflex, and, shortly thereafter, she filed her own discriminatory charges of age discrimination; and then shortly thereafter, at that point, I was terminated.

Q: And that's the sole basis for your belief that you were retaliated against?

A: Yes.

■ The parties do not refer to any cases binding on this court that accept or reject the legal theory of third-party retal-

iation as a viable cause of action under the TCHRA. We note, however, that the purpose of the TCHRA is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964.[2] TEX. LAB.CODE ANN. § 21.001(1) (Vernon 2006); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex.2001). Thus, analogous provisions of Title VII and the cases interpreting them guide our interpretation of the TCHRA. *Quantum Chem. Corp.*, 47 S.W.3d at 476.

There is a split of authority among federal courts regarding whether a plaintiff may assert a claim for retaliation when his employer targets him for an adverse employment action because of the protected activity of a third party such as a friend or relative. Some cases hold that recognizing such a cause of action furthers the purpose of federal anti-retaliation law.[3] However, the majority of federal courts who have considered the issue have refused to recognize third-party retaliation claims as valid causes of action under federal anti-retaliation laws.[4]

---

**2.** *See* 42 U.S.C.A.2000e–17 (West 2003).

**3.** *See, e.g., Gonzalez v. New York State Dep't of Corr. Servs. Fishkill Corr. Facility*, 122 F.Supp.2d 335, 347 (N.D.N.Y.2000); *E.E.O.C. v. Nalbandian Sales, Inc.*, 36 F.Supp.2d 1206, 1210 (E.D.Cal.1998); *McKenzie v. Atl. Richfield Co.*, 906 F.Supp. 572, 575 (D.Colo.1995); *De Medina v. Reinhardt*, 444 F.Supp. 573, 580 (D.D.C.1978).

**4.** *See, e.g., Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3d Cir.2002), *cert. denied*, 537 U.S. 824, 123 S.Ct. 112, 154 L.Ed.2d 35 (2002) (addressing provisions of the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act and stating, "Although ... recognizing third-party retaliation claims is more consistent with the purpose of the anti-discrimination statutes, we cannot say that prohibiting such claims is an absurd outcome that contravenes the clearly expressed intent of the legislature"); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th

Cir.1998) (holding that the "[proposed] rule—that a plaintiff bringing a retaliation claim need not have personally engaged in statutorily protected activity if his or her spouse or significant other, who works for the same employer, has done so—is neither supported by the plain language of Title VII nor necessary to protect third parties, such as spouses or significant others, from retaliation"); *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1227 (5th Cir.1996), *cert. denied*, 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997) (holding that a spouse who has not participated in protected conduct does not have automatic standing to sue for retaliation); *Thompson v. N. Am. Stainless, LP*, 435 F.Supp.2d 633, 638–40 (E.D.Ky.2006) (discussing the lack of binding precedent and holding that the plain language of analogous federal statute 42 U.S.C. § 2000e–3(a) does not permit a retaliation claim by a plaintiff who did not personally engage in protected activity); *Shoecraft v. Univ. of Houston—Victoria*, No. Civ.A. V–03–85, 2006 WL 870432, at *3 (S.D.Tex. March

In our interpretation of comparable Texas law, we begin with a familiar rule of statutory construction: if the statutory text is unambiguous, a court must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results. *Tex. Dept. of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex.2004). The plain text of section 21.055 is as follows:

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
>
> (1) opposes a discriminatory practice;
>
> (2) makes or files a charge;
>
> (3) files a complaint; or
>
> (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

TEX. LAB.CODE ANN. § 21.055 (Vernon 2006). Thus, the text of the statute unambiguously requires that the plaintiff personally engage in protected activity.

Interpreting the statute in accordance with its unambiguous language does not lead to absurd results. As the Third Circuit Court of Appeals noted, "there are at least plausible policy reasons" why the legislature might have intended to exclude third-party retaliation claims. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3d Cir.2002), *cert. denied,* 537 U.S. 824, 123 S.Ct. 112, 154 L.Ed.2d 35 (2002). "In most cases, the relatives and friends who are at risk for retaliation will have participated *in some manner* in a co-worker's charge of discrimination. The plain language of [the statute] will protect these employees from retaliation for their protected activities." *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1227 (5th Cir.1996), *cert. denied,* 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997.) Moreover, the legislature "may have feared that expanding the class of potential anti-discrimination plaintiffs beyond those who have engaged in protected activity to include anyone whose friends or relatives have engaged in protected activity would open the door to frivolous lawsuits and interfere with an employer's prerogative to fire at-will employees." *Fogleman,* 283 F.3d at 570.

We find this reasoning persuasive, and decline Dias's request that we expand the class of people to whom section 21.055 applies.

### 2. "Perception" of Assistance

Dias also argues that Goodman, Quietflex, and GHC perceived him as assisting

28, 2006) ("[T]he mere existence of a marital relationship between the employee engaged in protected activity and his/her spouse is not a sufficient connection to impute protected activity to that spouse"); *Singh v. Green Thumb Landscaping, Inc.*, 390 F.Supp.2d 1129, 1138 (M.D.Fla.2005) (refusing to recognize the plaintiff's cause of action for retaliation "based solely on his close association with his wife who engaged in protected activity"); *Higgins v. TJX Cos., Inc.*, 328 F.Supp.2d 122, 123 (D.Me.2004) (holding that neither Title VII nor analogous state law recognizes a cause of action for retaliation against a person who has not personally engaged in protected conduct); *U.S. E.E.O.C. v. Bojangles Rest., Inc.*, 284 F.Supp.2d 320, 327 (M.D.N.C. 2003) ("It is entirely possible that Congress could have written the statute as it did to eliminate frivolous suits by friends, relatives, or acquaintances of persons who do fall within the language of the statute"); *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F.Supp.2d 1123, 1143 (D.Kan.2002) ("The only federal circuit courts to have addressed this specific issue, however, have concluded (albeit sometimes reluctantly) that the plain text of Title VII's anti-retaliation provision and analogous provisions in other federal anti-discrimination statutes do not make actionable retaliation against an employee who has not engaged in protected activity.").

his mother with her age discrimination claim against Quietflex; however, no Texas courts follow the rule proposed by Dias that would allow a plaintiff to maintain an action against his employer for retaliation where the employer's adverse employment action was based only on the employer's "perception" that the plaintiff engaged in protected conduct. *See Salay v. Baylor Univ.*, 115 S.W.3d 625, 627 (Tex.App.-Waco 2003, pet. denied) (stating that the proposed rule "would effectively discount the plain words of the statute requiring active participation, interpreting it instead to prohibit retaliation when the employer *perceives* that an employee has participated in an investigation, proceeding or hearing under the [T]CHRA.... However, if the employee has not actually engaged in activity declared to be protected by the legislature, the application of a 'perception theory' would, in our view, encroach on the at-will employment doctrine without express legislative action"); *Attieh v. Univ. of Tex. at Austin*, No. 03-04-00450-CV, 2005 WL 1412124, at *7 (Tex.App.-Austin June 16, 2005, no pet.) (mem.op.) (following *Salay* and stating, "it is irrelevant whether the University mistakenly perceived that Attieh had engaged in a protected activity because statutorily it could not retaliate against her until she actually did so. Likewise, the mere anticipation that Attieh might engage in a protected activity in the future is insufficient to establish that the University retaliated against her under the statute.").

■ We agree with the reasoning in *Salay*. Because the plain language of section 21.055 addresses only the plaintiff's actions, it would be inconsistent with the expressed intent of the legislature and with our own role as a reviewing court to extend the statute's scope to situations in which the employer only *perceives* that the plaintiff has engaged in protected activity.[5]

### 3. Protected Activity

Dias also argues that he engaged in protected activity;[6] however, his own testimony describing his conduct establishes that the acts he performed do not fall within the scope of section 21.055:

Q: But these are the only two reasons that you believe the company perceived you as having assisted your

Q: And this was the COBRA forms that you got—

A: COBRA. That's correct.

Q: How else were you perceived by the company in this way?

A: Excuse me?

Q: How else were you perceived by the company as having assisted, participated with, or supporting your mother in her EEOC proceeding and/or as being a potential witness on your mother's behalf?

A: I'm not sure how they perceived that. Moreover, appellees produced evidence that Dias was not perceived to be assisting his mother in her age discrimination claim and was not considered a potential witness.

---

**5.** A review of the record also reveals less than a scintilla of evidence that appellees perceived Dias to be assisting his mother in her age discrimination claim. At best, appellees knew that Dias helped his mother obtain COBRA benefit forms:

Q: [In your petition], it states that you were perceived by defendants as having assisted, participated with, and supported your mother in her EEOC proceeding and/or as being a potential witness on your mother's behalf. How were you perceived by defendants?

A: You mean perceived by the company?

Q: Right.

A: They knew of my relationship with my mother, that she was my mother. That was public knowledge. They also know that I was helping her. I helped her get her benefits after her termination due to lack of company response.

**6.** Although not raised in his original petition, the issue was addressed in the appellees' motion for summary judgment and Dias's reply and was tried by consent.

mother, because they knew of your relationship with her and because you helped get her benefits forms?

A: Also, I approached my supervisor—

Q: Okay.

A: —and HR [Human Resources] to determine if there was anything I could do to alter her termination.

Q: Okay. Let's start with your supervisor. When did—

A: Ed Lilley. At the time was Ed Lilley.

Q: Okay.... When did you contact Ed Lilley?

A: I believe it was the day of [Shirley Dias's termination]. It may have been the day after.

Q: So, this was one conversation or more than one conversation?

A: I believe it was actually more than one.

Q: How many conversations did you have with Ed Lilley about your mother's termination?

A: I would say, in total, probably three.

Q: And were these all on the day of or the day after your mother's termination?

A: I believe so. Within that time frame, yes.

Q: Okay. Can you tell me about the first conversation?

A: I—I can't divide them up, exactly what details were discussed during which conversation. I just know that we discussed the issue a couple of times.

Q: Was it a couple of times or three times?

A: Three times.

Q: And this was over the course of two days?

A: Yes.

Q: Can you tell me about the substance of the conversations?

A: The substance of the conversation was that, you know, I was not unhappy and that I was—I was kind of looking for if he thought there was anything I could do.

Q: So, you asked him whether he thought there was anything you could do?

A: That's right. In other words, I was in a bad situation.

Q: Why were you in a bad situation?

A: Because it's my mother and I still need to keep my job.

Q: So, you asked Mr. Lilley if there was anything he thought that you could do because you were in a bad situation?

A: No. If I—if there's anything I could do to help my mother.

Q: And what did he say?

A: He didn't think so.

Q: Is that all he said?

A: He also advised that I stay quiet.

Q: Were those the words he used?

A: Pretty much, yes.

Q: Did he say anything else?

A: That was pretty much the gist of it, that I was better off being quiet and not to interfere, that I could not help her if I was unemployed. He also made that comment.

\* \* \* \* \*

Q: And you mentioned that you also talked to someone other than Mr. Lilley?

A: That is correct.

Q: Who is that?

A: Wanda Ford.

Q: And what was her position?

A: Her position was basically the same as Ed Lilley's, that there was noth-

ing I could do and that they—her opinion was I would be best by not taking it any farther. And I told her that, okay, I will do my job and not raise a ruckus or cause a stink or however you want to say that, I will not cause any problems.

\* \* \* \* \*

Q: So, all you really remember her saying is that there's nothing you could do and that it would be best not to take it any farther?

A: That's correct. And she did say, you know, go back and basically do your job.

Q: And did you have any conversations with anyone else at the company about your mother's termination?

A: No. I had people ask me about it, but I did not answer.

\* \* \* \* \*

Q: So, you said that Ed Lilley and Wanda Ford were the only two Goodman employees that you complained to about your mother's termination?

A: I did not complain. I discussed that with them. And that's all I recall, yes.

Q: Okay. So, I'm just trying to get at the reasons you believe that you were retaliated against. You said that the company knew of your relationship with your mother, you helped her get her COBRA forms, you discussed your mother's termination with Ed Lilley and Wanda Ford. Are there any other reasons that you believe you were retaliated against?

A: No.

\* \* \* \* \*

Q: And in any of those phone calls or e-mails [to get Shirley Dias's COBRA forms] did you ever mention that you were disturbed about your mother's termination?

A: No.

In sum, the conduct which Dias characterizes as protected activity consists of asking two people if there was anything he could do to help his mother and requesting forms related to medical insurance. These activities do not constitute opposing a discriminatory practice; making or filing charge; filing a complaint; or testifying, assisting, or participating in an investigation, proceeding, or hearing. Thus, by participating in these conversations and requests, Dias did not engage in an activity protected by section 21.055.

Because Dias bases his retaliation claim on activities that are not protected by section 21.055 and on legal theories that are not cognizable under Texas law, appellees successfully established that Dias cannot meet his burden to show a prima facie case of discrimination. In the absence of a prima facie case, the burden did not shift to Goodman to demonstrate a legitimate nondiscriminatory purpose for Dias's termination; thus, we affirm summary judgment as to Goodman without reaching Dias's remaining arguments that Goodman's stated reason for terminating him was pretextual or that his discharge was motivated in part by retaliation.

### B. Third–Party Interference and Integrated Enterprise Claims

In his second issue, Dias argues the trial court erred in granting summary judgment on his third-party interference claim against Quietflex. In his third issue, Dias contends the trial court erred in granting summary judgment to Quiet-

flex and GHC because, together with Goodman, the three entities constitute a single "integrated enterprise." Both claims rely on the same elements: to maintain a TCHRA suit against a defendant who is not his direct employer, a plaintiff must show that: (1) the defendant is an employer within the statutory definition of the TCHRA, (2) some sort of employment relationship exists between the plaintiff and a third party, and (3) the defendant controlled access to the plaintiff's employment opportunities and "denied or interfered with that access based on *unlawful criteria." NME Hosps., Inc. v. Rennels,* 994 S.W.2d 142, 147 (Tex.1999) (emphasis added).

In their motion for summary judgment, appellees argued that Dias could not satisfy the third prong of the *Rennels* test for two reasons: first, Quietflex and GHC did not control access to Dias's employment opportunities, and second, the companies did not deny or interfere with Dias's access to employment opportunities based on unlawful criteria. Dias's argument and evidence on the issue of "unlawful criteria" consists of the incorporation by reference of the same arguments and evidence proffered against Goodman. Specifically, Dias's argument regarding "unlawful criteria" both at trial and on appeal consisted of the sentence, "And, for all the reasons stated above, Dias has presented evidence of a retaliatory motive." As previously discussed, Dias's termination was not retaliatory as that term is interpreted under the TCHRA. Thus, the trial court correctly granted summary judgment in favor of Quietflex and GHC because their interference, if any, was not based on unlawful criteria.

We overrule Dias's second and third issues and affirm summary judgment as to GHC and Quietflex.

## VI. CONCLUSION

We conclude Dias did not engage in a protected activity, and further, we decline to recognize the "perception" and "third-party retaliation" claims as alleged; therefore, we affirm the trial court's grant of summary judgment.