Sherry Radack, Chief Justice *94 Plaintiff-appellee Zelma Ridley was an employee of defendant-appellant Metropolitan Transit Authority of Harris County (Metro). Ridley sued Metro, alleging disparate-treatment discrimination and retaliatory conduct leading to constructive discharge. The trial court denied Metro's Plea to the Jurisdiction, and Metro brought this interlocutory appeal. Because Ridley did not establish a prima facie case on either of her claims, the trial court lacked jurisdiction over her claims. Accordingly, we vacate the trial court's order and dismiss the appeal for lack of jurisdiction.
A. Plaintiff's Allegations[1]
Ridley is an African American female who was 65 years old when she filed the underlying lawsuit in 2015.
2008-2011
Metro hired Ridley in May 2008 as its Director of Transportation Service Delivery, a newly created position. She was hired on the recommendation of the Senior Director of Transportation, T. Mobley, also an African American female.
Less than a month later, Ridley was put on a list to be terminated as part of a "reduction in force." Mobley intervened, in light of the fact Ridley had just been hired into a new position. Ridley alleges that, although she was able to keep her job, "she has been subjected to continuing harassment since that time."
From 2008 through May 2010, F. Wilson was Metro's CEO. During that time period, A. Skabowski was elevated from his position as a supervisor in the quality control department to Executive Vice President of Metro. Ridley's petition alleges that Skabowski "has had numerous complaints filed against him for both racial and gender discrimination." It also alleges that Skabowski regularly engaged in discriminatory conduct towards Ridley until May 2010, when there was a reprieve. The change was brought about by Wilson's resigning as CEO in May 2010 on the heels of a grand jury investigation into document destruction and violation of "Buy America" laws.
G. Greanias replaced Wilson as CEO in May 2010, and Ridley alleges that, for a time, Skabowski's discriminatory conduct towards her was contained while Greanias held that position.
2011 Office Relocation
In 2011, Ridley's department relocated offices. All other Directors and Senior Directors were given offices on the second floor. After the move, all the other Directors' and Senior Directors' offices were set up for them, i.e., boxes unpacked, files placed in file cabinets, etc. In contrast, Ridley was given a small office on the first floor that was not large enough to accommodate her office furniture. Her items were left on her desk for her to unpack without assistance. For the next two years, Ridley endured, and complained about, her office being "stifling hot in the summer and extremely cold in the winter with no solution" offered. In 2013, it was discovered *95 that the duct work to her office had never been connected.
Ridley alleges that her office placement was part of a course of harassment against her. The person in charge of the office relocation program was a white male who had been considered for the position of Director of Transportation, but was passed over when Ridley was selected instead.
2012-2013
In December 2012, Greanias resigned as CEO, and Skabowski immediately resumed his discriminatory actions toward Ridley. For example, in early 2013, Skabowski asked for someone to confirm Sylvester Turner's plans for an event. Because Ridley had handled Turner's events in previous years, she called Turner's office and sent an email asking for details. According to Ridley's petition, "Skabowski subsequently said that there had been a complaint from Turner's office that [Ridley] had been contacting them excessively; however, when [Ridley] checked with Turner's office administrator she confirmed that there has been no such complaint from Turner's office."
In April 2013, Skabowski told Mobley that (1) Mobley could no longer delegate her authority to Ridley when absent, (2) Ridley should be placed on a Personal Improvement Plan (PIP) for "communication issues," and (3) Mobley was not to tell Ridley about Skabowski's criticisms of Ridley. Mobley reported to the Vice President of Human Resources, K. Kaufman, Mobley's "belief that Skabowski's criticisms of Ridley were because of Ridley's race and gender," and she sought guidance about how she was supposed to place Ridley on a PIP without being able to disclose Skabowski's criticisms or how to improve.
Mobley and Ridley met with Kaufman and M. Moore (another HR representative) to implement Ridley's PIP plan. According to Ridley's petition, the plan had "no objectives instead it consisted of a '360' which is a subjective review by other managers." Ridley voiced her objection to participation because "all of the other senior managers are white and influenced by Skabowski."
Shortly thereafter, Skabowski terminated Mobley's employment. Ridley, as Director of Transportation Service Delivery, alleges that she would normally be appointed as interim Senior Director of Transportation Service Delivery. Instead, Skabowski appointed R. Augustine, a white male who was Ridley's subordinate. Ridley asserts that Augustine had previously sued Metro, alleging he was not treated as well as African American employees.
Immediately after becoming Senior Director, Augustine began undermining Ridley's authority by meeting with employees under Ridley's supervision without notifying her.
September 2013-Ridley's Formal Discrimination Charge
On September 16, 2013, Ridley made a formal Charge of Discrimination with Metro's internal EEO office, complaining about race, gender, and age discrimination. Ridley alleges that she took this action in part because Kaufman and Moore failed to take any action on her complaints at their meeting about her PIP.
Ridley alleges that, in response to her charge, she was interviewed by Metro's outside counsel for several hours; he was not interested in her complaints, but only in convincing her she had not suffered discrimination. Ridley hired an attorney after the interview who requested to be present at any future interview. Nonetheless, Ridley was questioned again by a Metro lawyer D. Richard, the Vice President of Title VI, EEO and Diversity, without Ridley's counsel present.
*96 November 2013-Ridley's Annual Performance Review
On November 12, 2013, Ridley's annual performance review was conducted by Augustine. For the first time ever, she was rated as "not meeting the requirement of the job" in every category. In all past performance reviews at Metro, Ridley had been rated either "meeting" or "exceeding" the job requirements in every category. At the time of the November review, Augustine had only been Ridley's supervisor for three months, but she alleges it was clear to her "based on an earlier email," that "the comments in the review came from Skabowski."
Ridley's petition alleges that she had never been disciplined or had any performance issues until she complained of Skabowski's treatment of her.
November 18, 2013-EEOC Charge of Discrimination
In November 2013, Ridley filed a Charge of Discrimination with the Equal Employment Opportunity Commission/Texas Workforce Commission-Civil Rights Division. At the time Ridley's underlying petition in this case was filed on July 9, 2014, she alleged that more than 180 days had passed without a final decision from the EEOC.
2014
Augustine promoted four individuals to Service Supervisors, a position that had always reported to Ridley as Director of Transportation Service Delivery. These new employees were told instead to report directly to Augustine. Ridley was not involved in the interview process of these four employees.
Ridley's Medical Leave
Ridley was on FMLA leave between January 31, 2014 and March 17, 2014. When she returned to work March 17, she was told she needed a formal doctor's release before she could return. She obtained and provided that release to Metro the following day, Wednesday, March 18; the only restrictions placed by the doctor in the release to return to work were for her to wear tennis shoes and "limited walking and standing." While she was working on March 18, the HR department notified her she was being sent home because Augustine would not let her return to work under those restrictions.
Ridley's petition alleges that she has an office job that does not require walking or standing for any extended period. She contends that her treatment was "clearly retaliation by Augustine, because as managers [Ridley] and Augustine have to deal with employees who have medical restrictions all the time." Ridley alleges that she was only allowed to return to work after her attorney called Metro's in-house attorney to complain about the retaliation.
Continued Harassment
Augustine gave Ridley a mid-year, May 1, 2014 Performance Appraisal, the purpose of which is to discuss an employee's progress towards goals and objectives set forth in his or her annual evaluation. Despite a lack of goals or objectives set out in Ridley's earlier annual evaluation, Augustine rated her performance as needing improvement. Ridley was again placed on a PIP, which she alleges was "an obvious attempt to humiliate [her] and to burden her to such an extent that she would quit." In addition to her regular Director duties, the PIP called for her to-on alternating weeks-(1) spend 8 hours on a ride-along with a supervisor and fill out a route training form, and (2) spend an 8-hour shift with a bus-control employee. Ridley was not given direction as to what these tasks were designed to accomplish, and they required her to report to her subordinates.
*97 The PIP also called for bi-weekly meetings between Ridley and Augustine. Following the May 1, 2014 Performance Appraisal, however, Augustine did not meet with Ridley until June 23, 2014. Ridley alleges that it was clear at this meeting that Augustine had no idea what Ridley had done to comply with the PIP. He had not reviewed the "route training" logs he told her to complete, and he did not realize that Ridley had not been given any kind of log or documentation to complete during her bus control shifts. As described in Ridley's petition,
The items Augustine had required the Plaintiff to perform as part of the PIP had absolutely no relationship to her job description as the Director of Transportation. When Plaintiff pointed that out to Augustine he replied that a new job description was coming. When Plaintiff tasked what was the duration of the PIP (i.e. how long she was going to be required to work extra shifts that had nothing to do with her job) Augustine replied that it was "open ended." Plaintiff had worked as senior management at Metro for six years and had never heard of an "open ended" PIP.
Medical Concerns and Ridley's Retirement
In August 2014, Ridley went to the emergency room suspecting a heart attack. Testing revealed heart palpitations and rapid heartbeat that Ridley alleged was brought on "by stress from her work situation." Her doctor prescribed anti-anxiety medication and recommended that Ridley take early retirement.
Ridley's petition asserts that Augustine continued to harass her over the next few months, accusing her of not completing all of her extra bus-control and ride-along shifts and losing paperwork.
Confident that the situation would not improve, and on advice of her doctor, Ridley resigned in December 2014. Ridley asserts she was constructively discharged because "no reasonable person would have continued to work under the conditions being imposed by METRO."
B. Causes of Action
The entirety of the "Causes of Action" section of Ridley's petition contains the following:
Discrimination in Employment
Plaintiff has been discriminated against in her employment because of her race and gender and in retaliation for protesting a violation of the Texas Labor Code, in violation of chapter 21 of the Texas Labor Code. When Ridley complained about the discrimination she was retaliated against to the point of being constructively discharged.
C. The Trial Court's Denial of Metro's Plea to the Jurisdiction
Metro filed a motion to dismiss Ridley's suit for lack of jurisdiction, alleging that she did not, and cannot, meet her burden to establish a prima facie case of discrimination. On January 6, 2017, the trial court held a hearing on Metro's motion, and on January 10, 2017, it denied the motion. It is from that order that Metro appeals.
ISSUES ON APPEAL
Metro raises the following four issues here:
1. "Whether Ridley proved the second element of her retaliation claim, which required her to demonstrate she suffered an adverse employment action."
2. "Whether Ridley proved she suffered an adverse employment action by demonstrating constructive discharge."
*98 3. "Whether Ridley proved the third element of her retaliation claim, which required her to demonstrate a causal connection between her protected activity and the alleged adverse action."
4. "Whether Ridley proved the second and fourth elements of her prima facie case of disparate treatment discrimination, which required her to show that she was qualified for the position at issue and that she was treated less favorably than other similarly situated employees who were not members of the protected class, under nearly identical circumstances."
JURISDICTION
Subject-matter jurisdiction is essential to the authority of a court to decide a case and is never presumed. Tex. Ass'n of Bus. v. Tex. Air Control Bd. , 852 S.W.2d 440, 443-44 (Tex. 1993). Whether a court has subject-matter jurisdiction is a question of law, and without subject-matter jurisdiction, a court cannot render a valid judgment. Tex. Dep't of Parks & Wildlife v. Miranda , 133 S.W.3d 217, 226 (Tex. 2004). Analysis of whether subject-matter jurisdiction exists begins with the plaintiff's live pleadings. Id. A court must decide whether a plaintiff has affirmatively demonstrated a court's jurisdiction to hear a suit, based on the facts alleged by plaintiff and, when necessary to resolve jurisdictional facts, on evidence submitted by the parties. State v. Holland , 221 S.W.3d 639, 642-43 (Tex. 2007).
Metro has government immunity, except for limited waivers. One such limited waiver exists for employment discrimination claims under the Texas Commission on Human Rights Act (TCHRA), but immunity is waived only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim. Mission Consol. I.S.D. v. Garcia , 372 S.W.3d 629, 636 (Tex. 2012). Failure to demonstrate the prima facie elements-the necessary first step to bringing a discrimination claim under the TCHRA-means that the court has no jurisdiction and the claim should be dismissed. Id. at 637.
We have jurisdiction to review the granting or denial of a plea to the jurisdiction filed by a governmental unit. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014 (a)(8) (West 2014).
RETALIATION
Ridley's retaliation claims are brought under the TCHRA. See TEX. LAB. CODE ANN. §§ 21.001 -.556 (West 2006 & Supp. 2012). The TCHRA "is a comprehensive fair employment practices act and remedial scheme, modeled after Title VII of the federal Civil Rights Act of 1964 (Title VII) that provides the framework for employment discrimination claims in Texas." Prairie View A & M Univ. v. Chatha , 381 S.W.3d 500, 502-03 (Tex. 2012). "The TCHRA was enacted to address the specific evil of discrimination and retaliation in the workplace," as well as to coordinate and conform with federal anti-discrimination and retaliation laws under Title VII. City of Waco v. Lopez , 259 S.W.3d 147, 153-55 (Tex. 2008).
Ridley contends that 1) she was subjected to a hostile work environment because she complained about discrimination at Metro, and 2) when the hostile environment became so intolerable that a reasonable person would have felt compelled to resign, Ridley retired, which amounted to a constructive discharge. Although Ridley uses the phrase "hostile work environment," she clarifies in her brief that she was subjected to a hostile work environment as retaliation for engaging in protected *99 activity, not as a result of her race or gender:
Ridley readily admits that her work environment was not intolerable because of conduct related to her race and gender. Ridley contends that the hostility, i.e. taking away her job responsibilities; requiring her to report to her subordinates; requiring her to work extra shifts doing meaningless tasks unrelated to her job duties; refusing to allow her to return to work in violation of METRO's policies and without explanation; being subjected to derogatory and humiliating comments by her superior; being rated as being incompetent at her job after 5 years of good evaluations; etc. all stem from her complaining about race/gender discrimination.
(emphasis added). Accordingly, we analyze her hostile work environment allegations under TCHRA's retaliation framework.
The TCHRA makes retaliation for certain protected activities actionable:
§ 21.055. Retaliation
An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
(1) opposes a discriminatory practice;
(2) makes or files a charge;
(3) files a complaint; or
(4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.
TEX. LAB. CODE ANN. § 21.055 (West 2015).
In the absence of direct evidence of discrimination, the employee must make out a prima facie case of discrimination under the McDonnell Douglas burden shifting analysis. See McDonnell Douglas Corp. v. Green , 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973) ; Jespersen v. Sweetwater Ranch Apts. , 390 S.W.3d 644, 654 (Tex. App.-Dallas 2012, no pet.).
We recently explained that, "[t]o establish a prima facie [retaliation] case under ... the TCHRA, a plaintiff must show that (1) he participated in a protected activity, (2) his employer took an adverse employment action against him, and (3) a causal connection existed between his protected activity and the adverse employment action." Donaldson v. Tex. Dep't of Aging & Disability Servs. , 495 S.W.3d 421, 441 (Tex. App.-Houston [1st Dist.] 2016, pet. denied) (citing Dias v. Goodman Mfg. Co. , 214 S.W.3d 672, 676 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) ). "The employee must establish that absent his protected activity, the adverse employment action would not have occurred when it did." Id. "In other words, the plaintiff must prove that he would not have suffered an adverse employment action 'but for' engaging in the protected activity." Navy v. Coll. of the Mainland , 407 S.W.3d 893, 901 (Tex. App.-Houston [14th Dist.] 2013, no pet.). The employee need not, however, establish that the protected activity was the sole cause of the employment action. Donaldson , 495 S.W.3d at 441 (citing Herbert v. City of Forest Hill , 189 S.W.3d 369, 377 (Tex. App.-Fort Worth 2006, no pet.) ).
Accordingly, Ridley's burden in the trial court to defeat Metro's plea to the jurisdiction was to establish that (1) she engaged in a protected activity, (2) Metro took an adverse employment action against her, and (3) a causal connection existed between her protected activity and the adverse employment action.
1. Protected Activity
Ridley alleged, and offered evidence, that she first made a protected *100 complaint around April 2013 when she and Mobley met with HR representatives Kaufman and Moore to discuss the PIP Skabowski ordered Mobley to place Ridley on. Mobley expressed to Kaufman her belief that Skabowski's criticisms of Ridley were because of Ridley's race and gender. At their meeting, Ridley voiced objection to participating in a "360" plan that had no objectives and consisted entirely of a subjective review of her by other managers who were white and influenced by Skabowski.
In September 2013, Ridley made a formal Charge of Discrimination with Metro's internal EEO office, complaining about race, gender, and age discrimination.
In November 2013, Ridley filed a Charge of Discrimination with the EEOC. In March 2014, Ridley's attorney complained to Metro's legal department about Metro's alleged retaliation against her in refusing to allow her to return after medical leave with physical restrictions.
Ridley satisfied the first prong of her prima facie case because these complaints constituted protected activity. See TEX. LAB. CODE ANN. § 21.055 (defined as "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing").
2. Adverse Employment Action and Causal Link
Ridley's response to Metro's plea to the jurisdiction alleges that she "served in the role of Director of Transportation Service Delivery for METRO between 2008 and 2014, and ... during those five and one half years she frequently suffered discriminatory conduct at the hands of Andrew Skabowski." We can, however, consider only events that took place after Ridley engaged in a protected activity in deciding whether Metro took adverse employment action against Ridley that has a causal link to her protected activity for purposes of a retaliation claim. E.g., Brewer v. Coll. of the Mainland , 441 S.W.3d 723, 732 (Tex. App.-Houston [1st Dist.] 2014, no pet.). Thus, we look to the following allegations and evidence Ridley presented in her response about Metro's actions after April 2013:
On May 6, 2013, Kaufman met with Skabowski and reported the conversation that she had had with Mobley, including Mobley's allegations of race and gender discrimination. This is the first evidence of Skabowski's being told of Ridley's protected actions in opposing or reporting discrimination.
On June 26, 2013, Mobley-who had been supportive of Ridley-was fired. Termination of Mobley's employment does not constitute an adverse employment action against Ridley for purposes of supporting a retaliation claim. Cf. Dias v. Goodman Mfg. Co., L.P. , 214 S.W.3d 672, 678 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) (interpreting section 21.055 to only apply to retaliatory actions against the person who engaged in protected activity; refusing to interpret statute to encompass third-party retaliation).
In July 2013, Skabowski appointed Augustine, a white male who had worked as a Superintendent in the transportation department, to replace Mobley as Senior Director of Transportation. According to Ridley, "Skabowski, through Augustine, began a campaign to retaliate against Ridley for having made a claim of discrimination." Her response to Metro's plea to the jurisdiction identifies the specific acts by Augustine that she claims were retaliatory on Skabowski's behalf:
• Within weeks of him becoming the Senior Director in July 2013, Augustine made clear that he "did not want *101 to listen to anything Ridley had to say." He told her to repost employee assignments based on a "revised 'tenure' Augustine and Skabowski has devised." HR reversed that decision and reinstated the tenure calculation Ridley used.
• Augustine circumvented Ridley's authority to make decisions, and he met privately with employees who normally reported directly to her. For example, without consulting with Ridley, Augustine changed plans Ridley and her team developed for a "free fare day" over Labor Day weekend. Augustine claimed that Ridley was not at work early enough to consult, but she had always arrived at 9:00 a.m., and Augustine had never told her he wanted her to change her schedule. Ridley had a Metro-issued phone and iPad that Augustine could have used to contact her. Augustine told Ridley he would stop meeting with her subordinates, but he did not stop. By Fall 2013, Augustine was so condescending to Ridley-both alone and in front of subordinates-that Ridley felt that she needed to take action.
• On September 6, 2013, Ridley filed a formal written discrimination complaint with Metro's HR department. Her response to Metro's plea to the jurisdiction alleges: "After filing her complaint of discrimination Augustine became much more openly hostile towards Ridley."
• Augustine (and sometimes Augustine and Skabowski) started meeting with T. Maxwell, the Superintendent of Bus Control, without Ridley. Maxwell was supposed to report directly to Ridley. When Ridley complained to Augustine, Augustine told the bus controllers under Ridley's supervision that they no longer needed to report to Ridley.
• During this same time period, Ridley met with Augustine to discuss her achievements during fiscal year 2013 as part of the year-end performance evaluation process. Ridley outlined each of her accomplishments. Augustine did not indicate that he disagreed with her assessment of her accomplishments, nor did he complain about her performance.
• On November 13, 2013, Augustine emailed Ridley her 2013 Employee Performance Appraisal, in which he rated her "Does Not Meet the Requirements." This was a complete surprise to Ridley. Because Metro's fiscal year end was September 30, 2013, Augustine had been Ridley's supervisor for less than two months before he performed the evaluation. Before filing her EEO complaint with Metro, she had received good performance reviews. In 2008 she received a "Completely Satisfies"; in 2009, "a Top Performer"; in 2010, "Average"; 2011 and 2012, "Frequently Exceeds Requirements." Ridley alleged that she then "realized that METRO was not going to take any steps to prevent Skabowski and Augustine from continuing to retaliate against her, [so] she filed a Charge of Discrimination with the EEOC."
• In January 2014, Augustine hired four new Service Supervisors, a position that traditionally would report to the Assistant Superintendent Service Supervision, who in turn reported to Ridley. Ridley would normally have been involved in the hiring of the Service Supervisors, but she was not allowed to participate in the selection process. Augustine also selected four Service Supervisors to *102 report to him directly, which caused dissention because these four reporting to Augustine were given more favorable treatment than the others.
• On January 31, 2014, Ridley took approved FMLA leave to have foot surgery. She was released to return to work on March 17, 2014 with doctor's orders to wear tennis shoes and limit standing and walking. Augustine initially refused to allow her to return with these restrictions, despite her ability to still do her job. Only after Ridley's attorney intervened was she allowed to return to work.
• On May 1, 2014, Augustine placed Ridley on a PIP requiring, among other things, Ridley (1) ride with a Service Supervisor every other week for an eight-hour shift, (2) on alternating weeks, sit with a bus controller and participate hands-on in his or her duties (and have that controller sign an attendance sheet that Ridley was there), (3) prepare a plan for all major and minor special events and emergency situations, (4) hold monthly meetings with her team and their union to address concerns, (5) copy Augustine on all emails and take communication classes, (6) meet with procurement and accounts payable departments to learn the process of project management, and (7) take the following classes: Embracing Change, Driving Change, Emotional Intelligence, Delegating with Purpose, and Adaptive Leadership. Augustine stated later that this PIP was of an "open-ended" duration.
• On July 9, 2014, after deciding that many of Augustine's demands were meaningless and designed to force her to quit, Ridley filed the underlying lawsuit.
• In August 2014, Augustine and Ridley had a follow-up PIP meeting that Ridley asserted was worse than previous meetings. Augustine wrongfully accused her of not completing certain PIP requirements. Augustine also stated that W. Jackson with the union claimed that Ridley's union meetings got off to a "rocky start," despite Jackson not being at the union meetings. Augustine also criticized Ridley for forgetting to copy him on a single routine email, despite her copying him on hundreds of other emails sent out.
• Later in August 2014, Ridley woke up with a rapid heartbeat that was diagnosed as a panic attack. Her doctor prescribed medication and recommended that she consider taking early retirement.
• Augustine continued to harass Ridley for weeks, accusing her of losing paperwork and not completing her extra shifts, as well as generally questioning her truthfulness and competency.
• On September 17, 2014, Ridley went out on approved FMLA leave for additional foot surgery and other tests. When her leave expired, she was told that she had to return to work or be fired.
• On December 19, 2014, Ridley resigned from Metro.
Ridley argues on appeal that these facts establish the requisite causal link between her protected activity and alleged constructive discharge. She points to the temporal proximity between her complaints about discrimination and Metro's actions. She also argues that "Metro showed an increasing severe retaliation in response to Ridley's continuing discrimination complaints."
*103 Metro responds that the allegations and evidence Ridley relies upon fall far short of the causal connection she is required to establish to make a prima facie case of retaliation. It emphasizes that Ridley's performance issues predated her engaging in protected activity, and argues that the wheels of discipline were turning before her discrimination complaints, negating any causal link.
We agree with Metro that Ridley has failed to demonstrate a causal connection between her complaints and Metro's acts for purposes of establishing a prima facie case of retaliation. Accordingly, we need not determine which, if any, of Metro's actions qualify as adverse employment actions.
Circumstantial evidence sufficient to show a causal link between an adverse employment decision and the filing of a discrimination charge or suit may include (1) the employer's failure to follow its usual policy and procedures in carrying out the challenged employment actions; (2) discriminatory treatment in comparison to similarly situated employees; (3) knowledge of the discrimination charge or suit by those making the adverse employment decision; (4) evidence that the stated reason for the adverse employment decision was false; and (5) the temporal proximity between the employee's conduct and discharge. Crutcher v. Dallas Ind. School Dist. , 410 S.W.3d 487, 494 (Tex. App.-Dallas 2013, no pet.) (citing cf. Green v. Lowe's Home Ctrs., Inc. , 199 S.W.3d 514, 519 (Tex. App.-Houston [1st Dist.] 2006, pet. denied) ).
Application of these factors does not support a causal link here. Granted, Skabowski and Augustine did know about Ridley's discrimination complaints by May 2013. And, taking Ridley's allegations as true, neither Skabowski nor Augustine regularly expressed dissatisfaction with Ridley's job performance before they learned of her complaints. But there is no evidence that Metro failed to follow usual policies and procedures in dealing with Ridley. There is no evidence that Ridley was treated differently than other similarly situated employees.[2] And there is no evidence that the reasons Ridley were given for the dissatisfaction in her performance were false. See, e.g. , Donaldson , 495 S.W.3d at 444 (holding causal link between protected activity and adverse employment action was not established, in part because "Donaldson presented no evidence that DADS failed to follow its own policies and procedures in terminating his employment, treated other similarly-situated persons differently, or that the stated reasons for his termination were false"). Finally, and most importantly, Ridley's pleadings and evidence demonstrate that Metro's dissatisfaction with her job performance-and the actions it took to address that dissatisfaction-were ongoing both before and after her first complaint.
*104 Ridley cites her pleaded allegations and evidence about the years leading up to her first discrimination complaint and argues this information is relevant to the context of the environment she was working in. (citing Burlington N. & Santa Fe Ry. Co. v. White , 548 U.S. 53, 69, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.")). We agree that this context is relevant, but it undercuts, rather than supports, Ridley's claim that Metro's actions were in retaliation for her for making protected discrimination complaints.
For example, Ridley asserts in her petition that, immediately after being hired in 2008, she was put on a reduction-in-force list, but her position was saved by Mobley's intervention. She states that although she was able to keep her job, "she has been subjected to continuing harassment since that time." She then contends that "Skabowski regularly engaged in discriminatory conduct towards Ridley until May 2010," and that "in December 2012, Skabowski resumed his discriminatory conduct."
Ridley also claims that, in early 2013, Skabowski lied to her about the mayor's office being annoyed by Ridley's communications with that office. Shortly thereafter, Skabowski's actions explicitly made clear that, valid or not, he was concerned about Ridley's lack of management and communication skills. Skabowski prohibited Mobley from continuing to delegate her authority to Ridley when Mobley was absent. And Skabowski ordered Ridley to be put on a PIP to address her "communication issues" and "interactions with her subordinates."
All of these events took place before Ridley's first protected complaint for purposes of a retaliation claim. While she characterizes Metro's actions taken after her first complaint as "escalating" and "worse," the actions are nonetheless consistent with, and a continuation of, the actions taken before her complaint.
For example, the impetus for Ridley's first discrimination complaint was Skabowski's telling Mobley that (1) Mobley could no longer delegate her authority to Ridley when absent, (2) Ridley should be placed on a PIP, and (3) Mobley was not to tell Ridley about Skabowski's criticisms of Ridley. These actions by Metro taken before her first protected complaint are similar to those taken afterwards that she claims were causally linked to her complaints (i.e., being placed on a PIP, her supervisor expressing concerns about her communication skills, the circumventing of Ridley's role in communicating with others and the requirement that Ridley copy Augustine on communications).
Similarly, Ridley's assertions that Augustine undermined her authority with her subordinates after her protected complaint is consistent with Metro's pre-complaint action of prohibiting her from being delegated Mobley's authority in Mobley's absence and with Metro's decision to place her on a PIP to address problems with her communications and interactions with her subordinates. See, e.g. , Clark Cty. School Dist. v. Breeden , 532 U.S. 268, 272, 121 S.Ct. 1508, 1510-11, 149 L.Ed.2d 509 (2001) (recognizing that alleged adverse employment action contemplated by employer before, but carried out after, protected discrimination complaint is no evidence of a causal link to establish discrimination). Ridley makes much of the fact that her annual performance review rating was lower after her first protected complaint, but the fact that a new supervisor-Augustine-performed that review and rated her lower than her previous supervisors does not demonstrate *105 that the lower rating was retaliation rather than reflecting a new supervisor with different expectations.
Finally, while Ridley insists that the conditions of her 2014 post-complaint PIP were "an obvious attempt to humiliate ... and to burden her to such an extent that she would quit," she has not demonstrated that (despite her considering the conditions unnecessary) they were unreasonable or unrelated to legitimate employee-improvement goals rather than retaliation.
Ridley has established that her supervisory authority was diminished over time, her job performance rating fell, and that she was subjected to ever-growing, time-consuming hands-on training, required classes, and other remedial measures. We do not, and need not, determine whether any or all of these measures were warranted or whether, as she contends, they were instead driven by an animus towards her based on race, gender, or simply dislike. The narrow issue presented is whether she made a prima facie case that these actions were in retaliation for her complaints about discrimination.
In Bartosh v. Sam Houston State University , the plaintiff was harassed at work about her religious beliefs. 259 S.W.3d 317, 320 (Tex. App.-Texarkana 2008, pet. denied). She eventually reported the harassment, the harassment continued, and then her employment was terminated five and a half months later. Id. at 329. Her employer argued that there was no evidence that her termination was causally related to her protected reporting, and the court of appeals rejected the plaintiff's argument that the plaintiff could establish retaliation based on the continued harassment, even though the harassment was improper.
Bartosh's argument essentially is that the termination must have been a retaliatory one because she made a complaint and was terminated after continuing harassment on the basis of her religion. But, Bartosh's subjective belief as to the motivation for termination does not suffice. [M.D. Anderson Hosp. and Tumor Institute v.] Willrich , 28 S.W.3d [22] at 25 [ (Tex. 2000) ]. Moreover, to the extent Bartosh's evidence of retaliation is grounded in the underlying discrimination, it does not suffice. Bartosh "must offer evidence from which the jury may infer that retaliation, in whole or in part, motivated the adverse employment action." Roberson v. Alltel Info. Servs. , 373 F.3d 647, 655 (5th Cir. 2004).
Id. at 329-30.
Metro's actions that Ridley complains of happened both before and after her discrimination complaints. Granted, in some situations, "an escalating pattern of harassment, or that became worse after the [protected] report" can be indicative of retaliatory motive. Id. Here, Ridley asserts that is exactly what happened, i.e., that Metro's allegedly adverse employment actions escalated after her protected reporting. But, on this record, it is clear that the measures taken with regard to Ridley coincided with a change in her supervisor, not with her reporting discrimination. Because we conclude that Ridley did not establish a prima facie case of retaliation, we sustain Metro's third issue (no causal connection). Given this disposition, we need not reach Metro's first issue (no adverse employment action) or second issue (no constructive discharge).
DISPARATE TREATMENT
Ridley's disparate-treatment claim is based upon Skabowski's appointing Augustine to the position of Interim Senior Director to replace Mobley instead of appointing Ridley to the position. The TCHRA prohibits discrimination in employment based on "race, color, disability, religion, sex, national origin, or age."
*106 TEX. LAB. CODE ANN. § 21.051. In resolving disparate-treatment cases, the courts utilize the same McDonnell Douglas standard of shifting burdens that applies to retaliation cases, where "the burden of production shifts from the plaintiff to the defendant and then back to the plaintiff." Navy v. Coll. of the Mainland , 407 S.W.3d 893, 898 (Tex. App.-Houston [14th Dist.] 2013, no pet.) (citing Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ; McDonnell Douglas , 411 U.S. at 802-05, 93 S.Ct. at 1824-26 ).
The plaintiff's initial burden is to establish a prima facie case "requires proof that the plaintiff (1) is a member of a protected class, (2) was qualified for the employment position at issue, (3) was subject to an adverse employment action, and (4) was treated less favorably than similarly situated members outside of the protected class." Navy , 407 S.W.3d at 899.
The entirety of Ridley's allegation related to her disparate-treatment claim avers that a white male was appointed to an interim position that "normally" would be given to someone in Ridley's position:
Mobley was terminated by Skabowski less than 60 days after she told Kaufman that she thought Skabowski was discriminating against the Plaintiff. Normally Plaintiff, as the Director of Transportation Service Delivery would be appointed as the interim Senior Director until a permanent replacement was hired. Instead, Skabowski appointed Robert Augustine, a White male as the interim.
Metro's plea to the jurisdiction argued that she failed to establish a prima facie case of disparate treatment for a myriad of reasons: (1) no evidence Ridley was qualified for the position, (2) Ridley's concession that she was ineligible for the position because she was on a PIP, (3) Augustine had more seniority at Metro than Ridley, (4) appointment to an interim position is not an "ultimate employment decision" subject to disparate-treatment claims, and (5) this claim is not timely because it occurred more than 180 days before her formal charge.
In response, Ridley points out that she "was better educated than Augustine, having a Bachelors of Business Administration from UT-El Paso and a Masters of Business Administration from the University of Southern California." She also notes that while Augustine does have a longer tenure than Ridley at Metro, (1) much of that tenure was as a bus driver and a Manager of Service Supervision, and (2) prior to his replacing Mobley, "Augustine was a Superintendent of Transportation at one of Metro's garages, whereas Ridley had served as Director of Transportation Service Delivery for almost 5 years and had held a similar position at Dallas Area Rapid Transportation where she had been employed for almost 18 years.[3] Ridley's response summed up her reasoning with the contention that Skabowski placed her on a PIP because he knew he would be firing Mobley and wanted Ridley to be ineligible to replace her:
Normally, as the Director of Transportation Service Delivery, Ridley would have been named as Interim Director and would have been a candidate for the Senior Director's position. Skabowski prevented that from happening by putting Ridley on the Plan while acknowledging that Ridley's job performance as Director of Transportation Service Delivery *107 met or exceeded expectations. It would completely undermine the purpose of the TCHRA if an employer could avoid being liable for discrimination simply by administering unwarranted discipline for the purpose of preventing a minority candidate from being eligible for a promotion.
Metro argues that Ridley has not established "the second and fourth elements of her prima facie case of disparate treatment discrimination, which required her to show that she was qualified for the position at issue and that she was treated less favorably than other similarly situated employees who were not members of the protected class, under nearly identical circumstances." We agree.
Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct. Univ. of Tex. Med. Branch at Galveston v. Petteway , 373 S.W.3d 785, 789 (Tex. App.-Houston [14th Dist.] 2012, no pet.). Ridley makes conclusory allegations about her being more educated and experienced than Augustine, all the while admitting that she was ineligible to be promoted to the Interim Senior Director position because Skabowski placed her on a PIP before Mobley was fired to sabotage Ridley's eligibility for Mobley's position.
These allegations fall short of a prima facie claim. Ridley provides information about her education, but includes no information about Augustine's education, and then declares hers to be superior. The professional experience of hers and Augustine's that she refers to is not self-explanatory, nor is it susceptible to comparison, other than perhaps supporting the inference that they were not similarly situated at the time Augustine was appointed to replace Mobley. Herbert v. City of Forest Hill , 189 S.W.3d 369, 376 (Tex. App.-Fort Worth 2006, no pet.) ("More favorable treatment of a person outside a protected class can be used to show discrimination only if the circumstances are nearly identical."). And there is no evidence to support Ridley's assertion that placing her on a PIP was for any purpose other than professional development.
Because we conclude that Ridley has not established a prima facie case of disparate-treatment discrimination, we sustain Metro's fourth issue.
CONCLUSION
We vacate the trial court's order and dismiss this appeal for lack of jurisdiction.

The factual allegations in this section are taken from Plaintiff's First Amended Petition, which was her live pleading at the time of the trial court's ruling on Metro's Plea to the Jurisdiction.

Ridley does not offer any specific details about similarly situated employees. But she asserts that she has never heard of anyone being placed on an "open ended" PIP and that Augustine should have approved her medical restrictions when she returned to work after her FLMA leave because he has supervised people on medical restrictions in the past. She intimates that the only explanation for her allegedly different treatment in these two areas was retaliation. However, "an employee's subjective beliefs of retaliation are merely conclusions," not evidence in support of a retaliation complaint. Chandler v. CSC Applied Techs., LLC , 376 S.W.3d 802, 823 (Tex. App.-Houston [1st Dist.] 2012, pet. denied). Without evidence of similarly situated employees, Ridley's bare assertions about what she has heard or believes does not establish that she was treated differently from other similarly situated employees.

Ridley also stated in her response to Metro's plea to the jurisdiction (without citation to evidence) that tenure is not a factor in Metro's promotional decisions at the senior management level-only in considering promotions in hourly employees.